# STATE OF CONNECTICUT *v.*
# BRUCE JOHN BEMER
## (SC 20195)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Vertefeuille, Js.*

*Syllabus*

Pursuant to statute (§ 54-102a (a)), a court presiding over a pending case involving a violation of certain sex offenses, including patronizing a prostitute who was the victim of human trafficking, may order that the accused be examined for any sexually transmitted disease (STD).

Pursuant further to statute (§ 54-102a (b)), a court presiding over a pending case involving a violation of certain sex offenses during which a sexual act occurred, including patronizing a prostitute who was the victim of human trafficking, may order that the accused be tested for the presence of the human immunodeficiency virus (HIV), "[n]otwithstanding the provisions of" the statute (§ 19a-582) requiring a person's "general consent" for that person's HIV-related testing.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

State *v.* Bemer

The defendant, who had been charged with the crimes of patronizing a prostitute who was the victim of human trafficking and conspiracy to commit trafficking in persons, appealed from the trial court's order, in response to motions filed by the state and certain of the defendant's alleged victims, requiring that he submit to an examination for STDs pursuant to § 54-102a (a) and HIV testing pursuant to § 54-102a (b). The charges stemmed from the defendant's involvement with a person who had arranged for young males to engage in sexual activities with the defendant in exchange for money. On appeal, the defendant claimed, inter alia, that the trial court had abused its discretion in ordering HIV testing on the ground that the trial court was required to find, before issuing such an order, that there was a clear and imminent danger to the public health or the health of a person and that there was a compelling need for the HIV test result that could not be accommodated by other means, and the state presented no evidence in furtherance of satisfying that standard. The defendant also contended that, to the extent that an examination for STDs and HIV testing could be ordered under § 54-102a (a) and (b), respectively, without a finding of a compelling need, those statutory provisions violated the defendant's constitutional rights. During the pendency of this appeal, the defendant was convicted of the charged crimes. *Held*:

1. The trial court's order was an appealable final judgment, and the defendant's conviction of the charged crimes had no bearing, jurisdictional or otherwise, on this appeal: the court's order terminated a separate and distinct proceeding, as it involved a discrete matter entirely distinct from and independent of the adjudication of the defendant's guilt, and, accordingly, the proceedings concerning the propriety of that order were wholly severable from the proceedings pertaining to the resolution of the defendant's criminal case, which could and did advance separate and apart from this appeal; moreover, although § 54-102a authorizes a trial court to issue an order pursuant to that statute while a case is "pending" in that court, whereas a related statute (§ 54-102b) delineates the circumstances under which a defendant's HIV testing shall be ordered upon motion following conviction, there was nothing in § 54-102a or § 54-102b to suggest that § 54-102b was intended to place a temporal limitation on the execution of an order properly issued pursuant to § 54-102a prior to a conviction, and § 54-102b made no provision for the HIV testing of persons convicted of offenses of which the defendant ultimately was convicted.

2. The trial court did not abuse the discretion conferred on it by § 54-102a (b) in ordering that the defendant submit to HIV testing: there was no merit to the defendant's claim that the trial court was obligated to adhere to the requirement set forth in § 19a-582 (d) (8) that it find, before ordering HIV testing, a clear and imminent danger to the public health or the health of a person and that the person seeking the testing of the defendant has demonstrated a compelling need for the test result that

State *v.* Bemer

cannot be accommodated by other means, as a review of the language of § 54-102a (b), its legislative history, and related statutes, as well as the language of § 19a-582, indicated that the legislature did not intend for the requirement of § 19a-582 (d) (8) to apply to an order for HIV testing under § 54-102a (b); accordingly, § 54-102a (b) broadly authorizes a trial court to order HIV testing when, as in the present case, the conditions of that statute—that the defendant has been charged with committing an offense enumerated in that statute, the offense involved a sexual act, and the charge is pending before the court—have been met.

3. To comport with the provision of the Connecticut constitution (art. I, § 7) prohibiting unreasonable searches and seizures, a court is required to make a finding, prior to ordering an examination for STDs pursuant to § 54-102a (a) or HIV testing pursuant to § 54-102a (b), that such an examination or testing would provide useful, practical information to a victim that could not reasonably be obtained in another manner, but this court rejected the defendant's contention that a trial court must find, before issuing an order for such an examination or testing, that there is probable cause to believe that the defendant has an STD or HIV: this court reviewed the factors set forth in *State* v. *Geisler* (222 Conn. 672), which included consideration of federal case law concerning suspicionless searches and the special needs doctrine, sister state case law addressing the constitutionality of statutes that authorize nonconsensual HIV testing of persons charged with certain crimes, and contemporary understandings of applicable economic and sociological norms, and relevant public policies as reflected in the legislative history of § 54-102a, and concluded that the issuance of an order for HIV testing pursuant to § 54-102a (b) based solely on a finding that the conditions of that statute have been met violates a defendant's right to be free from unreasonable searches and seizures under article first, § 7, as, in many cases, such testing would provide no real benefit to the victim, and, under those circumstances, the state's interest in requiring testing is not sufficient to override a defendant's recognized privacy interest; accordingly, this court placed an interpretive gloss on § 54-102a to render it compatible with the requirements of article first, § 7, by requiring a court to find that an examination for STDs or HIV testing would provide useful, practical information to a victim that could not reasonably be obtained otherwise; moreover, because the trial court did not apply the foregoing standard and the state and the victims were not on notice that they were required to satisfy that standard in filing their motions pursuant to § 54-102a (a) and (b), the trial court's order was reversed, and the case was remanded for a new hearing on those motions.

(*Two justices concurring separately in one opinion*)

Argued October 21, 2019—officially released July 14, 2021**

---

** July 14, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Bemer

*Procedural History*

Substitute information charging the defendant with patronizing a prostitute and conspiracy to commit human trafficking, brought to the Superior Court in the judicial district of Danbury, where the court, *Shaban, J.*, granted, with certain restrictions, the state's and certain of the alleged victims' motions for an order directing the defendant to undergo an examination for sexually transmitted diseases and testing for the human immunodeficiency virus, from which the defendant appealed. *Reversed*; *further proceedings*.

*Wesley W. Horton*, with whom were *Brendon P. Levesque* and, on the brief, *Ryan Barry* and *Anthony Spinella*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Sharmese L. Hodge*, assistant state's attorney, for the appellee (state).

*James J. Healy*, *Gerald S. Sack*, *Joel T. Faxon* and *Kevin C. Ferry* filed a brief for the alleged victims as amici curiae.

*Opinion*

PALMER, J. After the defendant, Bruce John Bemer, was charged with patronizing a prostitute who was the victim of human trafficking in violation of General Statutes (Supp. 2014) § 53a-83 (c) (2) (A)[1] and conspiracy to commit trafficking in persons in violation of General Statutes (Rev. to 2011) §§ 53a-192a and 53a-

[1] This charge was based on conduct that allegedly had occurred between 2012 and 2016. Because the statutory subsection under which the defendant was charged, namely, subsection (c) of § 53a-83, did not go into effect until 2013; see Public Acts 2013, No. 13-166, § 3, we use the version of § 53a-83 that first contained that statutory subsection.

State *v.* Bemer

48,[2] the state filed a motion seeking a court order requiring the defendant to submit both to an examination for sexually transmitted diseases pursuant to General Statutes § 54-102a (a) and to testing for human immunodeficiency virus (HIV) pursuant to § 54-102a (b).[3] Thereafter, certain victims of the defendant's allegedly criminal misconduct filed similar motions. The trial court granted the various motions and ordered the defendant to submit to such an examination and testing. The defendant then filed this appeal,[4] claiming that the

---

[2] The conspiracy to commit trafficking in persons charge also was based on conduct that allegedly had occurred between 2012 and 2016. In the interest of simplicity, we use the statutory revision of § 53a-192a that was in effect at the beginning of that four year period.

[3] General Statutes § 54-102a provides in relevant part: "(a) The court before which is pending any case involving a violation of any provision of sections 53a-65 to 53a-89, inclusive, may, before final disposition of such case, order the examination of the accused person . . . to determine whether or not the accused person . . . is suffering from any sexually transmitted disease . . . .

"(b) Notwithstanding the provisions of section 19a-582, the court before which is pending any case involving a violation of section 53-21 or any provision of sections 53a-65 to 53a-89, inclusive, that involved a sexual act, as defined in section 54-102b, may, before final disposition of such case, order the testing of the accused person . . . for the presence of the etiologic agent for acquired immune deficiency syndrome or human immunodeficiency virus . . . . If the victim of the offense requests that the accused person . . . be tested, the court may order the testing of the accused person . . . in accordance with this subsection and the results of such test may be disclosed to the victim. The provisions of sections 19a-581 to 19a-585, inclusive, and section 19a-590, except any provision requiring the subject of an HIV-related test to provide informed consent prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection, shall apply to a test ordered under this subsection and the disclosure of the results of such test. . . ."

Although the state filed its motion before a 2018 amendment to subsection (a) of § 54-102a replaced the term "venereal disease" with "sexually transmitted disease"; Public Acts 2018, No. 18-168, § 29; we use the current revision of the statute in light of the potential for future litigation under the current statute. The amendment has no bearing on the merits of the defendant's appeal.

[4] The defendant appealed from the trial court's order to the Appellate Court, and we subsequently granted his motion to transfer the appeal to

State *v.* Bemer

trial court had abused its discretion in ordering testing under § 54-102a (b) because, the defendant maintains, that statutory subsection incorporates the standard set forth in General Statutes § 19a-582 (d) (8); see footnote 12 of this opinion; which requires the court to find that there is "a clear and imminent danger to the public health or the health of a person and that the person has demonstrated a compelling need for the HIV-related test result that cannot be accommodated by other means" before it may order HIV testing, and the state had presented no evidence in satisfaction of that standard.[5] The defendant further contends that, to the extent that subsections (a) and (b) of § 54-102a purport to authorize the trial court to issue orders thereunder without first making a finding of such compelling justification, they violate his rights under the fourth amendment to the United States constitution[6] and article first, § 7,

this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. After the appeal was filed, certain of the same victims who had filed motions under § 54-102a in the trial court sought permission to file an amicus curiae brief in this court in support of the state's position, and we granted that request.

[5] The defendant also claims that the trial court abused its discretion in ordering that he submit to testing for sexually transmitted diseases pursuant to § 54-102a (a). The portion of his brief addressing this claim, however, focuses exclusively on § 54-102a (b), and the defendant conceded at oral argument before this court that § 54-102a (a) does not incorporate the standard that he claims applies to § 54-102a (b). Accordingly, we conclude that any claim that the trial court abused its discretion in ordering an examination pursuant to § 54-102a (a) has been abandoned. The defendant has not, however, abandoned his contention that § 54-102a (a) is unconstitutional as applied to him on the ground that the state failed to establish probable cause to believe that examining him for sexually transmitted diseases was required to protect the health of the public or the alleged victims.

[6] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

State *v.* Bemer

of the Connecticut constitution.[7] After this appeal was filed, we directed the parties to brief, inter alia, the issue of whether the order for an examination and testing was an appealable final judgment.[8]

We conclude, preliminarily, that the trial court's order is an appealable final judgment. We further conclude that, under article first, § 7, of the Connecticut constitution, the trial court must make a finding that either an examination pursuant to § 54-102a (a) or testing pursuant to § 54-102a (b), or both, would provide useful, practical information to a victim that cannot reasonably be obtained in another manner before it may order such examination or testing, or both. Accordingly, we reverse the trial court's order and remand the case for a new hearing so that the trial court can apply the proper standard.

The record reveals the following undisputed facts and procedural history. On March 28, 2017, the defendant was arrested pursuant to a warrant and charged with patronizing a prostitute who was the victim of human trafficking and conspiracy to commit trafficking in persons. The arrest warrant application indicated that, on August 5, 2016, Danbury police officers interviewed the defendant in connection with their investigation of a prostitution ring involving the sexual trafficking of mentally disabled young men. The defendant told the police that, over the course of the previous twenty

---

[7] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[8] We note that, during the pendency of this appeal, the defendant was convicted, following a jury trial, of the underlying offenses. He has appealed from that conviction, and that appeal is currently pending before this court. As we discuss in greater detail in part I of this opinion, the fact that he has been convicted of those offenses has no bearing on the merits of the present appeal.

State *v.* Bemer

to twenty-five years, an individual by the name of Robert King had been arranging for young males to engage in sexual activities with him in exchange for money. The defendant stated that, to the best of his recollection, King had made arrangements for him to engage in sexual activities with eight to ten young men, most of whom the defendant had sex with multiple times. The arrest warrant application also indicated that one of the victims told the police that the defendant had performed fellatio on him.[9] The defendant told the police that the last occasion on which he had had sexual relations with a young man brought to him by King was approximately four months before the date of the interview.

On October 18, 2017, the state filed a motion seeking an examination of the defendant for sexually transmitted diseases under subsection (a) of § 54-102a and HIV testing of the defendant under subsection (b) of § 54-102a. The defendant opposed the motion on the ground that granting it without a prior showing of probable cause to believe that such an examination and testing would promote the health interests of the victims would serve no legitimate medical purpose and would therefore violate the defendant's rights under the fourth amendment and article first, § 7. Thereafter, victims represented by Attorney Joel T. Faxon, victims represented by Attorney Kevin C. Ferry, and victims represented by Attorney Gerald S. Sack filed three separate motions seeking the same relief. The trial court conducted a hearing on the motions, at which the assistant state's attorney and defense counsel appeared, and Faxon also appeared on behalf of certain victims. In addition, Attorneys Jonathan A. Cantor and Monique

_____

[9] The alleged victims contend in their amicus brief that "they were subjected [by the defendant] to much more than oral sex." No evidence as to the nature of the contact between the defendant and the victims, however, was presented to the trial court in connection with the motions for an examination and testing filed pursuant to § 54-102a.

State *v.* Bemer

Foley appeared on behalf of the other victims who had not filed motions under § 54-102a. Although the parties adduced no evidence at the hearing, Faxon referred to the contents of the arrest warrant during argument. In addition to a constitutional claim, defense counsel argued at the hearing that § 54-102a (b) and § 19a-582 (d) (8) must be read together to require the state and the victims to establish that the defendant posed a clear and imminent danger to the public health before the court could order HIV testing. Thereafter, the trial court summarily granted the motions.

This appeal followed. The defendant renews his claims that, under the statutory scheme, HIV testing authorized by § 54-102a (b) is conditioned on the showing mandated by § 19a-582 (d) (8), and, in any event, article first, § 7, of the state constitution requires proof of a compelling need for examination under § 54-102a (a) and testing under § 54-102a (b). We address each of these claims in turn.

I

Before doing so, however, we address two threshold issues that implicate this court's jurisdiction to entertain the present appeal: first, whether the trial court's order constituted an appealable final judgment and, second, what effect, if any, does the defendant's conviction have on this appeal.[10] Both the state and the defendant contend that the trial court's order was immediately appealable and that the defendant's conviction has no bearing on this appeal. We agree with the parties.

"[B]ecause our jurisdiction over appeals . . . is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from

[10] We directed the parties to address each of these two issues in supplemental briefs.

State *v.* Bemer

a final judgment before considering the merits of the claim . . . . It is well established that [t]he principal statutory prerequisite to invoking our jurisdiction is that the ruling from which an appeal is sought must constitute a final judgment.'' (Internal quotation marks omitted.) *State* v. *Anderson*, 318 Conn. 680, 698 n.6, 122 A.3d 254 (2015). ''The appealable final judgment in a criminal case is ordinarily the imposition of sentence. . . . In both criminal and civil cases, however, we have determined certain interlocutory orders and rulings of the Superior Court to be final judgments for purposes of appeal. An otherwise interlocutory order is appealable in two circumstances: (1) [when] the order or action terminates a separate and distinct proceeding, or (2) [when] the order or action so concludes the rights of the parties that further proceedings cannot affect them.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983).

''The separate and distinct requirement of *Curcio* demands that the proceeding [that] spawned the appeal be independent of the main action. . . . This means that the separate and distinct proceeding, though related to the central cause, must be severable therefrom. The question to be asked is whether the main action could proceed independent of the ancillary proceeding.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Parker*, 194 Conn. 650, 654, 485 A.2d 139 (1984).

It is clear, as both parties recognize, that the order at issue in the present case terminated a separate and distinct proceeding under *Curcio*'s first prong because that order involves a discrete matter entirely distinct from and independent of the adjudication of the defendant's guilt. As a consequence, the proceedings concerning the propriety of that order were wholly severable from the proceedings pertaining to the resolu-

State *v.* Bemer

tion of the defendant's criminal case, which could and
did advance separate and apart from this appeal. Cf.
*State* v. *Grotton*, 180 Conn. 290, 294–95, 429 A.2d 871
(1980) (questions involving fourth amendment viola-
tions must await review until after criminal trial and
conviction when there is "a functional link between the
consequences of an illegal search and seizure and a later
conviction in order to make any putative constitutional
error harmful and hence to require reversal"); id., 295
("[o]rders granting or denying suppression [of illegally
seized evidence] in the wake of . . . [suppression] pro-
ceedings are truly interlocutory, for the criminal trial is
then fairly in train" (internal quotation marks omitted)).
Indeed, the defendant's criminal trial concluded during
the pendency of this appeal; see footnote 8 of this opin-
ion; whereas the controversy concerning the order
issued pursuant to § 54-102a remains unresolved. We
conclude, therefore, that that order was an appealable
final judgment, and, consequently, it is properly the
subject of this appeal.

With respect to the issue of whether the defendant's
conviction has any effect on this court's appellate juris-
diction, that issue arises from the fact that § 54-102a
authorizes a trial court to issue an order thereunder
while a case is "pending" in that court, whereas General
Statutes § 54-102b[11] delineates the circumstances pursu-

---

[11] General Statutes § 54-102b provides in relevant part: "(a) Notwithstand-
ing any provision of the general statutes, except as provided in subsection
(b) of this section, a court entering a judgment of conviction or conviction
of a child as delinquent for a violation of section 53a-70b of the general
statutes, revision of 1958, revised to January 1, 2019, or section 53a-70, 53a-
70a, or 53a-71 or a violation of section 53-21, 53a-72a, 53a-72b or 53a-73a
involving a sexual act, shall, at the request of the victim of such crime,
order that the offender be tested for the presence of the etiologic agent for
acquired immune deficiency syndrome or human immunodeficiency virus
and the results be disclosed to the victim and the offender. The test shall
be performed by or at the direction of the Department of Correction or, in
the case of a child convicted as delinquent, at the direction of the Court
Support Services Division of the Judicial Department or the Department of
Children and Families, in consultation with the Department of Public Health.

State *v.* Bemer

ant to which HIV testing of a defendant shall be ordered upon motion following a conviction of certain enumerated offenses. There is nothing in § 54-102a or § 54-102b, or elsewhere in the statutory scheme, to suggest that § 54-102b was intended to place a temporal limitation on the execution of an order properly issued prior to conviction in accordance with § 54-102a. Moreover, § 54-102b applies to HIV testing only, and makes no provision for HIV testing of persons convicted of the offenses of which the defendant was convicted. Consequently, we agree with the parties that the fact that the defendant was convicted during the pendency of the present appeal has no bearing, jurisdictional or otherwise, on this appeal.

## II

We now turn to the defendant's claim that the trial court abused its discretion in ordering HIV testing pursuant to § 54-102a (b) because the court did not adhere to the requirement of § 19a-582 (d) (8)[12] that there first

_____

"(b) The provisions of sections 19a-581 to 19a-585, inclusive, and section 19a-590, except the requirement that the subject of an HIV-related test provide informed consent prior to the performance of such test, shall apply to a test ordered under this section. . . ."

[12] General Statutes § 19a-582 provides in relevant part: "(a) Except as required pursuant to section 19a-586, a person who has provided general consent as described in this section for the performance of medical procedures and tests is not required to also sign or be presented with a specific informed consent form relating to medical procedures or tests to determine human immunodeficiency virus infection or antibodies to human immunodeficiency virus. General consent shall include instruction to the patient that: (1) As part of the medical procedures or tests, the patient may be tested for human immunodeficiency virus, and (2) such testing is voluntary and that the patient can choose not to be tested for human immunodeficiency virus or antibodies to human immunodeficiency virus. General consent that includes HIV-related testing shall be obtained without undue inducement or any element of compulsion, fraud, deceit, duress or other form of constraint or coercion. If a patient declines an HIV-related test, such decision by the patient shall be documented in the medical record. The consent of a parent or guardian shall not be a prerequisite to testing of a minor. The laboratory shall report the test result to the person who orders the performance of the test.

State *v.* Bemer

must be a finding of "a clear and imminent danger to the public health or the health of a person and that the person has demonstrated a compelling need for the HIV-related test result that cannot be accommodated by other means." As the defendant notes, the state does not claim that the trial court made any such a finding or that the evidence presented at the hearing would have supported that finding. The state contends that § 54a-102a (b) does not incorporate § 19a-582 (d) (8) but, instead, broadly authorizes the trial court to order testing when, as in the present case, the defendant has been charged with committing an offense enumerated in § 54a-102a (b) that involved a sexual act. We agree with the state.

Whether § 54-102a (b) incorporates § 19a-582 (d) (8) is an issue of statutory interpretation. "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the

* * *

"(d) The provisions of this section shall not apply to the performance of an HIV-related test:

* * *

"(8) Under a court order that is issued in compliance with the following provisions: (A) No court of this state shall issue such order unless the court finds a clear and imminent danger to the public health or the health of a person and that the person has demonstrated a compelling need for the HIV-related test result that cannot be accommodated by other means. In assessing compelling need, the court shall weigh the need for a test result against the privacy interests of the test subject and the public interest that may be disserved by involuntary testing, (B) pleadings pertaining to the request for an involuntary test shall substitute a pseudonym for the true name of the subject to be tested. The disclosure to the parties of the subject's true name shall be communicated confidentially, in documents not filed with the court, (C) before granting any such order, the court shall provide the individual on whom a test result is being sought with notice and a reasonable opportunity to participate in the proceeding if he or she is not already a party, (D) court proceedings as to involuntary testing shall be conducted in camera unless the subject of the test agrees to a hearing in open court or unless the court determines that a public hearing is necessary to the public interest and the proper administration of justice . . . ."

State *v.* Bemer

language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Ugrin* v. *Cheshire*, 307 Conn. 364, 379–80, 54 A.3d 532 (2012). Furthermore, "[t]he legislature is always presumed to have created a harmonious and consistent body of law . . . [so that] [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Sokaitis* v. *Bakaysa*, 293 Conn. 17, 23, 975 A.2d 51 (2009). Because issues of statutory construction raise questions of law, they are subject to plenary review on appeal. See, e.g., *Ugrin* v. *Cheshire*, supra, 379.

We begin with § 19a-582, subsection (a) of which sets forth a general rule broadly requiring consent for HIV related testing.[13] Subsection (d) carves out a number of exceptions to that consent requirement, one of which, set forth in subdivision (8), is a court order issued in compliance with certain very stringent conditions.

Section 54-102a (b) in turn provides in relevant part that, "[n]otwithstanding the provisions of section 19a-

[13] Subsections (b) and (c) of § 19a-582, which pertain to persons administering tests authorized under that section, are not relevant to this appeal.

State *v.* Bemer

582,'' the trial court may, in specified criminal cases, order HIV testing of the defendant. Such testing is also subject to the following proviso: ''The provisions of sections 19a-581 to 19a-585, inclusive, and section 19a-590, *except any provision requiring the subject of any HIV-related test to provide informed consent prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection*, shall apply to a test ordered under this subsection and the disclosure of the results of such test.'' (Emphasis added.) General Statutes § 54-102a (b).

The interpretive issue presented stems from the parties' dispute over the proper reading of the ''[n]otwithstanding the provisions of section 19a-582'' language contained in the first sentence of § 54-102a (b) in light of the final sentence of that subsection, providing that a range of statutes, including § 19a-582, applies to any HIV testing order issued under § 54-102a (b), ''except any provision requiring the subject of an HIV-related test to provide informed consent prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection . . . .'' General Statutes § 54-102a (b). The defendant contends that the only way to reconcile these two provisions is to construe the ''notwithstanding'' clause to apply *only* to the consent requirement of subsection (a) of § 19a-582 and *not* to the various exceptions to that requirement set forth in subsection (d) of § 19a-582. Thus, in the defendant's view, subsection (d) of that statute, which allows testing without consent only under the conditions specifically enumerated therein, including the court order provision specified in subdivision (8), is not excepted from the purview of § 54-102a (b), and, therefore, the rigorous requirements of subdivision (8) of § 19a-582 (d) must be met prior to the issuance of an order for HIV testing

State *v.* Bemer

under § 54-102a (b). The state contends, to the contrary, that, because both the first and third sentences of § 54-102a (b) explicitly or implicitly provide that the consent requirement of § 19a-582 (a) does not apply to orders issued pursuant to § 54-102a (b), the *exceptions* to the consent requirement of § 19a-582 (d) also do not apply. In effect, then, the state's interpretation treats § 54-102 (b) like the other exceptions to § 19a-582 (a) that are enumerated in § 19a-582 (d).

Although § 54-102a (b) is not a model of clarity, the interpretation advanced by the state is reasonable, whereas the defendant's is not. First, it is difficult to understand why, if, as the defendant concedes, the consent requirement set forth in § 19a-582 (a) does not apply to persons who are subject to § 54-102a (b), the *exceptions* to that consent requirement set forth in § 19a-582 (d) are nevertheless applicable. We see no logical reason to separate the exceptions to the general rule from that rule itself, at least not without a clear indication from the legislature, in the statutory language or otherwise, that it intended to disconnect the one from the other. In contrast, treating § 54-102a (b) as an exception to the general consent requirement of § 19a-582 (a) affords it a meaning and significance consistent with a commonsense reading of the statutory language, considered in the broader context of the overall purpose of the statutory scheme.

Second, the defendant's proposed construction of § 54-102a (b) renders that provision largely superfluous. Because § 19a-582 (d) preexisted the enactment of § 54-102a (b), it *already* provided the court with authority to order an HIV test upon proof of an imminent danger to health and a compelling need that could not otherwise be met. In fact, the history of the legislation that is now codified as amended at § 54-102a (b); see Public Acts, Spec. Sess., May, 1994, No. 94-6, § 27 (Spec. Sess.

State *v.* Bemer

P.A. 94-6);[14] reveals that a number of persons who submitted written testimony to the Judiciary Committee in opposition to its enactment pointed out that sexual assault victims already were allowed to seek such a court order. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1994 Sess., p. 1577, written testimony of Connecticut Sexual Assault Crisis Services, Inc. ("Connecticut law already allows a victim to seek a court order for the testing of an assailant and, if applicable, disclosure of the assailant's test results"); id., p. 1582, written testimony of Suzanne Mazzarelli, Counselor/Advocate, Susan B. Anthony Project Sexual Assault Crisis Services ("Connecticut law already allows a victim to seek [a] court order for the testing of an assailant, and, if applicable, disclosure of the assailant's test results"); id., p. 1583, remarks of Sarah Wilson, Lobbyist, Connecticut Chapter of the National Organization for Women ("[c]urrent law already allows a victim to seek a court order for the testing of an assailant and, if applicable, the disclosure of these results"). We must presume that the legislature intended to provide something more than what the law already

---

[14] The legislation that was ultimately enacted as Spec. Sess. P.A. 94-6, § 27, was first introduced as Substitute House Bill No. 5790 during the regular session of the General Assembly in 1994. Substitute House Bill No. 5790 was passed temporarily on the last day of the regular 1994 session. See 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7684; see also Connecticut General Assembly, Glossary—Legislative Terms and Definitions, available at http://www.cga.ct. gov/asp/content/terms.asp (last visited July 13, 2021) (defining "pass temporarily" as "[t]o suspend consideration of a particular bill for a short time, for example to await an amendment or the answer to a question"). During the May, 1994 special session of the General Assembly, legislation identical to the temporarily passed Substitute House Bill No. 5790 was introduced as an amendment to House Bill No. 6010, which the legislature ultimate enacted. See 37 H.R. Proc., Pt. 25, May, 1994 Spec. Sess., p. 9013, remarks of Representative Richard D. Tulisano (proposed legislation "follows in total . . . a bill that passed this House in the last day of the [regular] session"). We refer to the debate on both Substitute House Bill No. 5790 and the amendment to House Bill No. 6010 in our discussion of the legislative history of Spec. Sess. P.A. 94-6, § 27.

State *v.* Bemer

provided. See, e.g., *American-Republican, Inc.* v. *Waterbury*, 183 Conn. 523, 529–30, 441 A.2d 23 (1981) ("[w]e cannot assume that the legislature would perform the useless act of correcting a deficiency in the statute [that] did not exist").

Thus, under the defendant's reading of § 54-102a (b), a victim in a criminal case would receive no substantive benefit from the provision. Rather, its utility would be limited to affording such a victim the option of seeking an order under § 19a-582 (d) (8) in the criminal case itself—an alternative that otherwise would not be available to a victim, who, as a nonparty, would lack standing to move for a testing order in the criminal case[15]— instead of doing so in another pending action or in a new proceeding. This interpretation of § 54-102a (b) is manifestly implausible for a number of reasons. First, if providing an alternative forum for a victim requesting an order pursuant to § 19a-582 (d) (8) were all the legislature intended to accomplish by its enactment of § 54-102a (b), it easily could have achieved that result merely by adding a few words to § 19a-582 (d) (8) rather than by enacting an entirely new—and somewhat obtusely worded—statutory provision. And because the relevant language of § 54-102b, pertaining to HIV tests upon the motion of a victim following conviction, is materially identical to that of § 54-102a, we also would have to presume that the legislature opted to enact § 54-102b rather than tweaking the text of § 19a-582 (d) (8) slightly to reflect its purportedly modest intentions. We do not

---

[15] "It is a basic tenet of the criminal justice system that prosecutions are undertaken and punishments are sought by the state on behalf of the citizens of the state, and not on behalf of particular victims or complaining witnesses. . . . A criminal prosecution is a public matter and not a contest between the defendant and his victims, or their relatives. . . . It is axiomatic, therefore, that [t]he parties to a criminal action are the [state], in whose sovereign name it is prosecuted, and the person accused . . . and *not* the crime victim(s)." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gault*, 304 Conn. 330, 342–43, 39 A.3d 1105 (2012).

State *v.* Bemer

believe that the legislature would have enacted multiple new statutory provisions—which, as we discuss more fully in part III of this opinion, were the subject of extensive legislative discussion and debate—if its intent were to accomplish only the extremely limited objective attributed to it by the defendant.

Another even more compelling reason to reject the defendant's construction of § 54-102a (b) stems from the fundamental purpose of the provision. As we also explain in greater detail in part III of this opinion, the impetus behind both §§ 54-102a (b) and 54-102b was to avert the state's loss of certain federal grant money, the receipt of which was conditioned on the enactment of §§ 54-102a (b) and 54-102b. Construing those provisions as advocated by the defendant—that is, requiring that the category of victims identified in those provisions also satisfy the exceedingly stringent conditions of § 19a-582 (d) (8)—would fly in the face of the decidedly pro victim policy the provisions undisputedly were intended to promote. Thus, no one in the legislature reasonably could have believed that merely enabling a victim to seek an order under § 19a-582 (d) (8) in a criminal case would have afforded the state even the remotest chance of forestalling the loss of federal funding. There is absolutely no reason, moreover, why those provisions would have prompted any legislative discussion at all, let alone the robust debate they did generate, if they were intended only to ensure that a victim could seek an order under § 19a-582 (d) (8) in a criminal case.

In fact, aspects of the relevant legislative history provide clear indication that § 54-102a (b) was not intended to incorporate the clear and imminent danger/compelling need standard of § 19a-582 (d) (8). Representative Robert Farr explained that the person who would be subject to the testing order "would have every right to refuse to take the test, every right protected right now . . . *that a defendant would have on giving a blood*

State *v.* Bemer

*test for other purposes* . . . .'' (Emphasis added.) 37
H.R. Proc., Pt. 21, 1994 Sess., p. 7640. When the state
seeks a search warrant for a blood sample for the pur-
pose of providing evidence of a defendant's guilt, it
need not establish an imminent danger to the public
health or a compelling need for the test that cannot be
accommodated by other means. Rather, a defendant
can be compelled to give a blood sample merely upon
a showing of probable cause. See, e.g., *State* v. *Grant*,
286 Conn. 499, 514, 944 A.2d 947, cert. denied, 555 U.S.
916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

Representative Robert M. Ward stated during the
debate that, by enacting the proposed legislation, ''[a]ll
we're doing is extending the current law as to venereal
diseases . . . .'' 37 H.R. Proc., supra, p. 7642; see also
id., remarks of Representative Ward (''[t]here's no real
harm done to the defendant [by ordering an HIV test],
and if they can be tested for venereal disease, why not
also include in that test a test for . . . [HIV]?''). As
the defendant in the present case conceded at oral
argument before this court; see footnote 5 of this opin-
ion; the preconditions for ordering an HIV related test
under § 19a-582 (d) (8) do not apply to motions for
examination for sexually transmitted diseases pursuant
to § 54-102a (a) or, presumably, to its predecessors.
Representative Ward further stated that the trial court
would be able to exercise its discretion in a proceeding
on a motion for an HIV test pursuant to the proposed
legislation, without giving any indication that there
were severe limitations, like those set forth in § 19a-
582 (d) (8), on the court's discretion to grant such a
motion. See 37 H.R. Proc., supra, p. 7642; see also 37
H.R. Proc., Pt. 25, May, 1994 Spec. Sess., p. 9015, remarks
of Representative Ward (testing order is ''up to the
judge's discretion when he listens to both [the victim
and the defendant] and presumably to the state's attor-
ney as well'').

State *v.* Bemer

Additional considerations support the state's construction of § 54-102a (b). As we noted previously, the pertinent language of § 54-102a (b), pertaining to HIV testing in pending cases, and of § 54-102b, pertaining to HIV testing in cases following the defendant's conviction, is materially identical, such that § 19a-582 (d) (8) either applies to both of those provisions or to neither. Consequently, under the defendant's statutory construction, the extremely strict, clear and imminent danger/compelling need requirement of § 19a-582 (d) (8) also applies to § 54-102b, when the defendant *has been found guilty beyond a reasonable doubt of sexually assaulting the victim.* It simply is impossible to believe that the legislature would have imposed that same exacting standard when the state has already established that the victim was sexually assaulted by the defendant *and* in all other circumstances in which someone is prompted, for whatever reason, to seek an order requiring another person to submit to an HIV test.[16]

_____

[16] In agreeing with the defendant's proposed construction of § 54-102a (b), the concurrence acknowledges that the *sole* effect of interpreting the provision in that manner would be to afford a victim in a criminal case the opportunity to seek a testing order under § 19a-582 (d) (8)—with its exceedingly stringent clear and imminent danger/compelling need requirement—in that criminal case rather than in a new or pending civil action. See footnote 4 of the concurring opinion. Although, as we previously explained, this construction is belied by the far broader and more ambitious purpose of the provision—namely, to provide sexual assault victims in criminal cases with simple and straightforward means of determining whether their alleged assailants have HIV—the concurrence makes no mention of that purpose, which is clearly reflected in the relevant legislative history and manifests the intent of the legislature to promote the strong pro victim policy mandated by the federal government under the threat of loss of certain federal funding. As we also explained, under the statutory construction advanced by the defendant and the concurrence, a victim seeking a testing order for a convicted defendant under § 54-102b would *still* have to satisfy the extremely strict conditions of § 19a-582 (d) (8), even after the defendant has been found beyond a reasonable doubt to have sexually assaulted the victim. It could hardly be more apparent that this construction of §§ 54-102a (b) and 54-102b cannot be squared with the well-defined legislative policy underlying the enactment of those provisions.

State *v.* Bemer

Moreover, under § 54-102a (b), the court in a pending criminal case "may" issue a testing order upon the motion of the victim, whereas, under § 54-102b, the court "shall" issue the requested order following the defendant's conviction. This permissive/mandatory distinction makes perfect sense if those provisions are construed as the state contends: the court *may*, in the exercise of its discretion, order the nonconsensual HIV testing of a defendant in a pending criminal case, and *must* issue such an order upon a finding of the defendant's guilt beyond a reasonable doubt. The distinction makes little or no sense, however, if both §§ 54-102a (b) and 54-102b are construed to require a victim to satisfy the stringent requirements of § 19a-582 (d) (8),[17]

Indeed, the thrust of the concurrence seems to be that § 54-102a operates as an unwarranted curtailment of the rights of criminal defendants relative to the protections afforded others who may find themselves the subject of a request for a nonconsensual HIV testing order. The concurrence's quarrel in this regard is with the legislature, not with us, because § 54-102a represents a legislative policy decision—prompted by the potential loss of federal money—to make it appreciably easier for certain sexual assault victims to obtain such an order.

Although § 54-102a certainly achieves that end, the concurrence claims that the provision, as we construe it, truncates the rights of those criminal defendants to whom it applies to a greater degree than it actually does. More specifically, the concurrence suggests that our "holding . . . jettisons the procedural safeguards contained in § 19a-582 (d) (8) (B) through (D)." However, a review of those provisions, which are designed to protect the identity of a party who is subject to an HIV order, reveals that they generally are not relevant to a request for such an order in a criminal case in which the identity of the defendant and the nature of his or her alleged offenses already are a matter of public record. The concurrence also contends that our construction of § 54-102a (b) "leads to an inconsistency in the provision of counseling services, which would be afforded to victims, but not to criminal defendants who test positive for HIV." In fact, the "counseling" services to which General Statutes § 54-102c refers are certain publicly available "educational materials" and "information" obtainable through the Department of Public Health, all of which a defendant, or his or her counsel, may readily obtain upon request.

[17] Thus, under the interpretation of § 54-102a (b) urged by the defendant, the trial court would have discretion to refuse to order an HIV test, *even after finding* that all of the requirements of § 19a-582 (d) (8) have been met—that is, after finding that the defendant poses "a clear and imminent danger to . . . the health" of the victim *and* that the victim "has demonstrated a compelling need for the HIV-related test result that cannot be

State *v.* Bemer

and we see no reason why the legislature would have
sought to achieve such a bizarre result.[18]

For all the foregoing reasons, we agree with the
state's contention that, as long as the conditions set
forth in § 54-102a (b) are satisfied, that is, the defendant
has been charged with one of the offenses enumerated
in the statute, the alleged offense involved a completed
sexual act, as defined in General Statutes § 54-102b (c),
and the criminal case is pending, the trial court acts
within its discretion under the applicable statutory lan-
guage when it grants a motion for HIV testing.[19] In other
words, the legislature did not intend for the require-
ments of § 19a-582 (d) (8) to apply to an order for testing

accommodated by other means." We see no reason why a court *ever* would
decline to issue such a testing order once it has found that these requirements
have been satisfied. If, though, the defendant's proposed construction of
§ 54-102b is correct, the legislature intended to grant the court discretion
to decline to order a test in such circumstances because no such discretion
is granted under § 54-102a, which is applicable to the testing of convicted
defendants and *requires* the court to issue a testing order upon the request
of the victim. In contrast to the defendant's interpretation, the two provisions
are entirely logical under the construction we adopt: if, as in the present
case, the criminal case is pending, then the court has discretion to order a
test, whereas the court must do so once the defendant has been found guilty.

[18] We note that the concurrence claims that our reading of § 54-102a (b)
would lead to a bizarre and unworkable result in one respect, namely, that,
in certain circumstances, a victim would not be able to obtain the very test
results that he or she sought under that provision. Although we disagree
with this assertion for a number of reasons, it suffices to say that the court
has broad authority under § 54-102a (b) both to order testing of the defendant
upon the request of the victim and to order that the test results be disclosed
to the victim, and there is nothing in the statutory scheme limiting the
court's discretion to determine how best to accomplish such disclosure in
light of the particular circumstances involved.

[19] Three additional points bear emphasis. First, under the state's construc-
tion of § 54-102a (b), the defendant's interest in preventing the unwarranted
or inappropriate disclosure of privileged testing information is safeguarded.
See, e.g., General Statutes § 19a-583 (a) (subject to certain enumerated
exceptions, "[n]o person who obtains confidential HIV-related information
may disclose or be compelled to disclose such information"); General Stat-
utes § 19a-583 (b) ("[n]o person . . . to whom confidential HIV-related
information is disclosed may further disclose such information, except as

State *v.* Bemer

under § 54-102a (b).[20] Because there is no dispute that those conditions have been met in the present case,

provided in this section and sections 19a-584 and 19a-585''); General Statutes § 19a-585 (containing additional safeguards against undue dissemination of HIV related test results or related information). Second, as we discuss in part III of this opinion, article first, § 7, of the state constitution prohibits a court from issuing an HIV testing order under § 54-102a (b) without first finding that such an order would provide useful, practical information to a victim that cannot reasonably be obtained by other means. Finally, as we explained in part I of this opinion, the defendant has the right to immediate appellate review of any order issued pursuant to § 54-102a (b). Thus, a defendant has considerable protection with respect to a court's exercise of its discretion to order an HIV test under § 54-102a (b) and to the use and dissemination of the results of any such test.

[20] We recognize, of course, that, when possible, statutes are to be construed to avoid constitutional infirmity. See, e.g., *Mayer-Wittman* v. *Zoning Board of Appeals*, 333 Conn. 624, 638, 218 A.3d 37 (2019) Reliance on that principle for purposes of the present case, however, is misplaced for several reasons. First, although a constitutional gloss is necessary to preclude such an infirmity under our reading of § 54-102a (b); see part III of this opinion; the very same tenet of construction that directs us to interpret a statute to avoid placing it in constitutional jeopardy—so long as that interpretation is consistent with legislative intent—also directs us to "search for a judicial gloss [on the statute] . . . that will effect the legislature's [intent] in a manner consistent with constitutional safeguards." (Internal quotation marks omitted.) *State* v. *DeCiccio*, 315 Conn. 79, 149, 105 A.3d 165 (2014). Because it is evident, for the reasons previously enumerated, that our construction of § 54-102a (b) is the only reasonable one in light of its text, its relationship to other statutory provisions, and its clear purpose, such a gloss is both necessary *and* fully consistent with our rules of statutory construction.

Furthermore, the canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts. . . . *The canon is thus a means of giving effect to* [*legislative*] *intent, not of subverting it*." (Citations omitted; emphasis added.) *Clark* v. *Martinez*, 543 U.S. 371, 381–82, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005). As we explained, the unmistakable intent behind § 54-102a was to facilitate the examination or testing of criminal defendants for sexually transmitted diseases or HIV, respectively, at the request of sexual assault victims. Construing § 54-102a as the defendant asserts it should be construed—that is, by reading § 19a-582 (d) (8) into it and thereby placing the burden on the victim to satisfy the same stringent conditions that existed prior to the enactment of § 54-102a—would not substantively advance the interests of sexual assault victims in any way, let alone in the distinctly pro victim manner intended by the legislature.

In addition, even if we were to interpret § 54-102a (b) to avoid the need for a constitutional gloss on *that* statutory subsection, we still would have to place the identical gloss on its companion subsection, § 54-102a (a),

State *v.* Bemer

the trial court did not abuse the discretion conferred
by the statute in granting the motions for testing. We
turn, therefore, to the issue of whether those statutory
requirements are sufficient to satisfy the protections of
the state constitution.

## III

The defendant claims that subsections (a) and (b) of
§ 54-102a violate article first, § 7, of the state constitu-
tion insofar as they purport to authorize the trial court
to order an examination for a sexually transmitted dis-
ease or testing for HIV without probable cause to
believe that a defendant is suffering from such a disease
or virus, without a showing that an examination or
testing will assist the state in the criminal case, and
without any evidence that it will advance the health
interests of the victim or the public.[21] We conclude that,

pertaining to examination for sexually transmitted diseases. See part III of
this opinion. We see no legitimate basis for presuming that the legislature
was attentive to the need to avoid placing an interpretive gloss on § 54-102a
(b) but not on the closely related provisions of § 54-102a (a).

Finally, our refusal to engage in such a presumption finds support in the
fact that, when § 54-102a was enacted in 1994, there was no suggestion in case
law from this or any other jurisdiction that subjecting a criminal defendant
in a sexual assault case to an HIV testing order at the victim's request was
constitutionally suspect. Indeed, because the impetus for the legislation was
the federal government itself, it is hardly likely that our legislature harbored
any concern that such a testing provision was of questionable constitutional-
ity. And even today, more than twenty-five years after the enactment of
§ 54-102a in this state and the enactment of virtually identical provisions in
many other states, we know of no other court that has found such a provision
to be unconstitutional or determined that an interpretive gloss was necessary
to avoid constitutional infirmity. In these circumstances, the tenet of statu-
tory construction on which the concurrence relies simply has no utility in
evaluating legislative intent.

[21] We first address the defendant's claim under the state constitution
because there is no clear and binding precedent on the issue of whether a
statute authorizing mandatory examinations for sexually transmitted dis-
eases and mandatory testing for HIV of individuals charged with certain
sexual offenses is reasonable under the fourth amendment in the absence
of a showing of probable cause to believe that testing is necessary to advance
the health interests of the victim or the public. See, e.g., *State* v. *Kono*, 324
Conn. 80, 123, 152 A.3d 1 (2016) ("if the federal constitution does not clearly
and definitively resolve the issue in the defendant's favor, we turn first to the

State *v.* Bemer

under article first, § 7, the trial court is required to make a finding that an examination or testing pursuant to § 54-102a (a) and (b), respectively, would provide useful, practical information to a victim that cannot reasonably be obtained in another manner before it may order such an examination or testing. We reject, however, the defendant's contention that the court must find probable cause to believe that the defendant has a sexually transmitted disease or HIV before an order under § 54-102a may be issued.

"Determining the constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405, 119 A.3d 462 (2015).

To provide context for our state constitutional analysis, we begin with a review of the general principles governing warrantless searches. We note, as a threshold matter, that it is firmly established that "[a] blood test . . . constitutes a search and seizure under the federal and state constitutions." *State* v. *Grotton*, supra, 180 Conn. 293. Accordingly, the state concedes that, as a general rule, it cannot constitutionally compel an individual to submit to a blood test in the absence of proba-

state constitution to ascertain whether its provisions entitle the defendant to relief'').

State *v.* Bemer

ble cause and a warrant.[22] See, e.g., *Schneckloth* v.
*Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed.
2d 854 (1973) (''[i]t is well settled under the [f]ourth
and [f]ourteenth [a]mendments that a search conducted
without a warrant issued upon probable cause is per
se unreasonable . . . subject only to a few specifically
established and [well delineated] exceptions'' (internal
quotation marks omitted)).

There are exceptional circumstances, however, in
which the government may conduct a search without
a warrant, without probable cause and, indeed, without
any showing of individualized suspicion. See, e.g., *Skin-
ner* v. *Railway Labor Executives' Assn.*, 489 U.S. 602,
624, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) (in excep-
tional circumstances, ''a search may be reasonable
despite the absence of [individualized] suspicion''). Spe-
cifically, ''[w]hen faced with special law enforcement
needs, diminished expectations of privacy, minimal
intrusions, or the like, the [United States Supreme
Court] has found that certain general, or individual,
circumstances may render a warrantless search or sei-
zure reasonable. . . . Those circumstances diminish
the need for a warrant, either because the public inter-
est is such that neither a warrant nor probable cause
is required . . . or because an individual is already on
notice, for instance because of his employment . . .

---

[22] The defendant does not claim that a warrant would be required in a
proceeding under § 54-102a if the trial court were constitutionally required
to make a finding of probable cause to believe that an examination or testing
is necessary to protect the health interests of the victim. This court previously
has held, in the civil context, that an adversarial proceeding at which the
party seeking an order to conduct a search must prove probable cause is
an acceptable substitute for a warrant, in part because ''there are no statutory
or regulatory provisions for the issuance of search warrants to facilitate
regulatory searches . . . .'' (Internal quotation marks omitted.) *Bozrah* v.
*Chmurynski*, 303 Conn. 676, 694, 36 A.3d 210 (2012). Similarly, in the present
case, because the purpose of an order pursuant to § 54-102a is not to obtain
evidence for use at the criminal trial, a search warrant would not be an
appropriate mechanism to compel a defendant to provide a blood sample.

State *v.* Bemer

or [because of] the conditions of his release from government custody . . . that some reasonable police intrusion on his privacy is to be expected.'' (Citations omitted; internal quotation marks omitted.) *Maryland* v. *King*, 569 U.S. 435, 447, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (2013).

Even in such cases, however, a search ''must be reasonable in its scope and manner of execution.'' Id., 448. ''To say that no warrant is required is merely to acknowledge that rather than employing a per se rule of unreasonableness, we balance the [privacy related] and [law enforcement related] concerns to determine if the intrusion was reasonable. . . . This application of traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which [the search] intrudes [on] an individual's privacy.'' (Citation omitted; internal quotation marks omitted.) Id.; see also *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 624.

With this general background in mind, we turn to the defendant's claim that, to the extent that § 54-102a (a) and (b) authorizes the trial court to issue an order for an examination or testing without a showing of probable cause to believe that such examination or testing will advance the health interests of the victim or the public, the statute runs afoul of article first, § 7, of the state constitution. The state contends that, to the contrary, the statute passes constitutional muster because it falls within the ''special needs'' exception to the probable cause requirement.[23]

''[I]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, 222

[23] We note that the defendant does not claim that there is no special needs exception to article first, § 7, of the state constitution. Accordingly, we assume for purposes of this opinion that there is.

State *v.* Bemer

Conn. 672, 685, 610 A.2d 1225 (1992)]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]. . . . We have noted, however, that these factors may be inextricably interwoven, and not every [such] factor is relevant in all cases.'' (Internal quotation marks omitted.) *State* v. *Kono*, 324 Conn. 80, 92, 152 A.3d 1 (2016).

We begin by addressing the first and second prongs of *Geisler*. With respect to the text of article first, § 7, this court previously has held that, because it is similar to the text of the fourth amendment, that consideration alone provides no reason to depart from the interpretation of the federal constitution by the United States Supreme Court. See, e.g., *State* v. *Miller*, 227 Conn. 363, 381, 630 A.2d 1315 (1993). Despite the linguistic similarity, however, this court has held in a variety of contexts that the state constitution provides greater protection against governmental searches and seizures than does the federal constitution. See id., 382 (''article first, § 7, provides broader protection than does the fourth amendment against warrantless searches of automobiles that have been impounded at police stations, even though probable cause exists''); *State* v. *Oquendo*, 223 Conn. 635, 652, 653, 613 A.2d 1300 (1992) (under state constitution, unlike federal constitution, ''what starts out as a consensual encounter becomes a seizure if, on the basis of a show of authority by the police officer, a reasonable person in the defendant's position would have believed that he was not free to leave''); *State* v. *Geisler*, supra, 222 Conn. 690 (in contrast to exclusionary rule under fourth amendment, ''the

State *v.* Bemer

exclusionary rule under article first, § 7, requires that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances''); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (unlike exclusionary rule under fourth amendment, ''a good faith exception to the exclusionary rule does not exist under [article first, § 7, of the state constitution]''); *State* v. *Dukes*, 209 Conn. 98, 120, 547 A.2d 10 (1988) (''to the extent that [*United States* v. *Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)] allows unlimited searches in contexts that extend beyond full custodial arrests [under the fourth amendment], we disavow its holding concerning the level of protection to which individuals are entitled against unreasonable searches and seizures under article first, § 7, of the Connecticut constitution''). Although none of these cases involves the specific issue presented by this appeal, we agree with the defendant that they generally support the proposition that article first, § 7, is more protective of the privacy rights of our citizenry than the fourth amendment.

We next consider *Geisler*'s third and fourth prongs, persuasive state and federal precedent. As we previously discussed, the general rule applied by both state and federal courts is that probable cause and a warrant are required for a search in the absence of exceptional circumstances in which the government's '' 'special law enforcement needs' '' outweigh the intrusion on the individual's constitutional interests. *Maryland* v. *King*, supra, 569 U.S. 447. Although the United States Supreme Court has not addressed the precise question that is the subject of this appeal, a sampling of the court's cases applying the special needs exception provides guidance regarding the nature and scope of the special needs doctrine and its potential applicability to examinations and testing under § 54-102a.

State *v.* Bemer

In *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 602, the court considered the constitutionality of federal regulations requiring railroad employees who are involved in certain accidents to submit to blood and urine tests for alcohol and drugs. Id., 606. The regulations also authorized breath and urine tests to be administered to employees who violate certain safety rules. Id. The court concluded that the government's interest in promulgating those regulations fell into the special needs exception to the requirement of probable cause and a warrant because (1) the "covered employees [were] engaged in [safety sensitive] tasks"; id., 620; and were required to "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences"; id., 628; (2) " 'the burden of obtaining a warrant [was] likely to frustrate the governmental purpose behind the search' " because "the delay necessary to procure a warrant . . . [could] result in the destruction of valuable evidence," namely, evidence of the level of alcohol and drugs in the employee's bloodstream at the time of the accident; id., 623; (3) testing would deter employees from using drugs and alcohol while on duty because they could not predict the timing of the tests; id., 629; and (4) "[t]he testing procedures . . . help railroads obtain invaluable information about the causes of major accidents . . . and . . . take appropriate measures to safeguard the general public" from recurrences. (Citation omitted.) Id., 630. The court also concluded that the special needs of the government outweighed the employees' privacy interests because (1) the intrusions occasioned by the blood, breath and urine tests were not significant; id., 624–26; and (2) "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." Id., 627. Accordingly, the court

State *v.* Bemer

concluded that the regulations survived fourth amendment scrutiny. Id., 633.

In a second decision issued on the same day as *Skinner*, the United States Supreme Court undertook to determine the constitutionality of a drug testing program that required individuals to submit to drug tests as a condition for placement in any position in the United States Customs Service that involved drug interdiction or the carrying of firearms. See *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 660–61, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989). The court determined that the government had a substantial interest in ensuring that employees were physically fit and that they not be tempted by bribes from drug traffickers or by access to the large amounts of contraband seized by the Customs Service. Id., 669–70. The court further explained that the government had an interest in testing employees who are armed because of the risk of ''injury to others that even a momentary lapse of attention'' could create. (Internal quotation marks omitted.) Id., 670. With respect to the employees' privacy interests, the court observed that ''employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty . . . have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test.'' Id., 672. The court ultimately concluded that the government's compelling interests in safeguarding the border and public safety outweighed the employees' privacy interests, and, therefore, the drug testing program was reasonable under the fourth amendment. Id., 677.[24]

[24] In his dissenting opinion in *Von Raab*, Justice Scalia distinguished the case from *Skinner*, in which he had joined the majority, on the ground that, in *Skinner*, ''the demonstrated frequency of drug and alcohol use by the targeted class of employees, and the demonstrated connection between such use and grave harm, rendered the search a reasonable means of protecting society.'' *National Treasury Employees Union* v. *Von Raab*, supra, 489 U.S. 680 (Scalia, J., dissenting). In contrast, because ''neither frequency of use nor connection to harm [was] demonstrated or even likely'' in *Von Raab*,

State *v.* Bemer

Thereafter, in *Chandler* v. *Miller*, 520 U.S. 305, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997), the court considered the constitutionality of a Georgia statute requiring candidates for certain state offices to certify that they had taken a drug test and that the test result was negative. Id., 308. The court observed that its precedents, including *Skinner* and *Von Raab*, "establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the [f]ourth [a]mendment's normal requirement of individualized suspicion." Id., 318. The court further observed that Georgia had produced no evidence that it had a particular problem with state officeholders abusing drugs or that the testing scheme, which would allow candidates for office to abstain from drug use before testing, would deter candidates who use drugs from seeking office. Id., 319–20. The court concluded that, because "public safety [was] not genuinely in jeopardy, the [f]ourth [a]mendment preclude[d] the suspicionless search, no matter how conveniently arranged." Id., 323.

Finally, and most recently, in *Maryland* v. *King*, supra, 569 U.S. 435, the United States Supreme Court considered whether a Maryland statute authorizing the taking of a DNA sample as part of a routine booking procedure for serious offenses violated the fourth amendment. Id., 440. The court concluded that the state had a significant interest in knowing the identity and criminal history of an arrestee that the state has taken into custody in order to assess the danger that the arrestee poses to the staff of the facility where the arrestee is detained, other detainees and the public. Id., 449–56. The court further concluded that "[t]he special needs cases, though in full accord with the [conclusion

Justice Scalia would have concluded that the drug testing program was unconstitutional. Id., 681 (Scalia, J., dissenting).

State *v.* Bemer

that the DNA testing procedure is constitutional], do not have a direct bearing on the issues presented in [the] case, because unlike the search of a citizen who has not been suspected of a wrong, a detainee has a reduced expectation of privacy.'' Id., 463. In addition, the DNA test was not intended to reveal any private medical information, which ''would present additional privacy concerns . . . .'' Id., 465. Accordingly, the court rejected the fourth amendment challenge to the statute.[25] Id., 465–66.

We glean the following general principles from these cases. First, under the special needs doctrine, the government interest that is furthered by a suspicionless search must be ''substantial . . . .'' *Chandler* v. *Miller*, supra, 520 U.S. 318; see id. (''the proffered special need . . . must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the [f]ourth [a]mendment's normal requirement of individualized suspicion''); see also *Maryland* v. *King*, supra, 569 U.S. 448 (characterizing government interest in requiring DNA test as part of routine booking procedure as ''[u]rgent''); *National Treasury Employees Union* v. *Von Raab*, supra, 489 U.S. 670 (suspicionless drug testing was permissible under fourth amendment because government had ''a compelling interest in ensuring that [frontline] interdiction personnel are physically fit . . . and have unimpeachable integrity and judgment''); *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 624 (suspicionless search may be justified when government interest is ''important''). Second, the need for the search cannot be established by conclusory assertions of need

––––––––––––––

[25] In his dissenting opinion in *King*, Justice Scalia contended that the DNA testing procedure had nothing to do with identifying *arrestees* but was intended to identify the source of the DNA of persons who had committed unsolved crimes. See *Maryland* v. *King*, supra, 569 U.S. 470–76 (Scalia, J., dissenting). Accordingly, he concluded that the DNA testing procedure was an unconstitutional suspicionless search. Id., 481 (Scalia, J., dissenting).

State *v.* Bemer

or the desire to send a symbolic message but, rather, must be supported by evidence in the record. See *Chandler* v. *Miller*, supra, 321, 322 (suspicionless drug testing of candidates for state office in Georgia was not reasonable when government presented "no evidence of a drug problem among the [s]tate's elected officials" and the need established was merely "symbolic"). Third, "the government's interest in dispensing with the warrant requirement is at its strongest when . . . the burden of obtaining a warrant [would] likely . . . frustrate [the underlying] governmental purpose . . . ." (Internal quotation marks omitted.) *Skinner* v. *Railway Labor Executives' Assn.*, supra, 623; see also *Chandler* v. *Miller*, supra, 314 (suspicionless search may be reasonable when "an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion" (internal quotation marks omitted)). Fourth, the government's interest must outweigh the privacy interests of the subject of the search. See *National Treasury Employees Union* v. *Von Raab*, supra, 665 ("it is necessary to balance the individual's privacy expectations against the [g]overnment's interests"); see also *Maryland* v. *King*, supra, 448 (court is required "to weigh the promotion of legitimate governmental interests against the degree to which [the search] intrudes [on] an individual's privacy" (internal quotation marks omitted)).

As we indicated, the United States Supreme Court has not yet had occasion to apply these principles to a statute that authorizes HIV testing of persons charged with certain crimes.[26] Several other courts, however, have had the opportunity to do so, and they have uni-

[26] The discussion that follows addresses HIV testing rather than examinations for sexually transmitted diseases because the case law appears to be more developed with respect to the issue of HIV testing. As we explain hereinafter, however, our reasoning and conclusion regarding the propriety of HIV testing under the state constitution are also applicable to examinations for sexually transmitted diseases.

State *v.* Bemer

formly concluded that such statutes do not violate constitutionally protected privacy rights. See, e.g., *United States* v. *Ward*, 131 F.3d 335, 342 (3d Cir. 1997) (federal statute authorizing victims to request court order for HIV testing of defendants charged with certain offenses was constitutional); *Johnetta J.* v. *Municipal Court*, 218 Cal. App. 3d 1255, 1260, 1285, 267 Cal. Rptr. 666 (1990) (California statute requiring HIV testing of defendants charged with interfering with peace officer by biting officer was constitutional under federal and California constitutions).[27] A closer examination of these

[27] See, e.g., *Fosman* v. *State*, 664 So. 2d 1163, 1164–67 (Fla. App. 1995) (Florida statute requiring court to order HIV testing of defendant charged with certain offenses was constitutional under fourth amendment); *Adams* v. *State*, 269 Ga. 405, 405, 410, 498 S.E.2d 268 (1998) (Georgia statute authorizing court to order HIV testing of defendants charged with certain offenses was constitutional under fourth amendment); *State in the Interest of J. G.*, 151 N.J. 565, 570, 588, 701 A.2d 1260 (1997) (New Jersey statute requiring juveniles charged with certain offenses to submit to HIV testing was constitutional under fourth amendment and New Jersey constitution in cases in which there had been possible transfer of bodily fluids); *People* v. *Thomas*, 139 Misc. 2d 1072, 1074–75, 529 N.Y.S.2d 429 (1988) (rejecting claim that New York statute authorizing HIV testing of defendants charged with certain crimes violated fourth amendment and granting request for testing order); *State* v. *Houey*, 375 S.C. 106, 109–10, 113, 651 S.E.2d 314 (2007) (South Carolina statute authorizing court to order HIV testing of defendants charged with certain offenses was constitutional under South Carolina and federal constitutions); see also *Harris* v. *Thigpen*, 941 F.2d 1495, 1512 (11th Cir. 1991) (Alabama statute requiring testing of inmates for HIV upon admission to and within thirty days of release from prison did not violate constitutionally guaranteed privacy rights); *Dunn* v. *White*, 880 F.2d 1188, 1197 (10th Cir. 1989) (nonconsensual testing of prisoner for HIV did not violate fourth amendment), cert. denied, 493 U.S. 1059, 110 S. Ct. 871, 107 L. Ed. 2d 954 (1990); *State* v. *Superior Court*, 187 Ariz. 411, 417, 930 P.2d 488 (App. 1996) (Arizona statute allowing victim of delinquent act committed by juvenile that would be sexual offense if committed by adult to request HIV testing of juvenile was constitutional under fourth amendment), review denied, Arizona Supreme Court, Docket No. CV-96-0498-PR (January 14, 1997); *Love* v. *Superior Court*, 226 Cal. App. 3d 736, 746, 276 Cal. Rptr. 660 (1990) (California statute requiring defendants convicted of certain sexual offenses to undergo HIV testing was constitutional under fourth amendment); *People* v. *Adams*, 149 Ill. 2d 331, 333, 351–52, 597 N.E.2d 574 (1992) (Illinois statute requiring court to order HIV testing of defendants convicted of certain crimes was constitutional under fourth amendment and Illinois constitution); *People*

State *v.* Bemer

cases reveals that they do not support court-ordered testing under the present circumstances. First, the cases involving HIV testing of defendants who have been convicted or incarcerated are distinguishable from the present case. Although an individual who has been charged with a crime has, in certain respects, diminished expectations of privacy; see, e.g., *Maryland* v. *King*, supra, 569 U.S. 448 (holding that warrantless DNA test of defendant charged with serious offense was constitutional because, among other reasons, "[t]he arrestee is already in valid police custody for a serious offense supported by probable cause"); those privacy expectations are less diminished than those of a defendant who has been convicted. See, e.g., *Harris* v. *Thigpen*, 941 F.2d 1495, 1514 (11th Cir. 1991) ("prisoners' constitutional rights are necessarily subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and [to] maintain institutional security"); *Dunn* v. *White*, 880 F.2d 1188, 1194 (10th Cir. 1989) (defendant's "incar-

v. *C.S.*, 222 Ill. App. 3d 348, 350, 353, 583 N.E.2d 726 (1991) (Illinois statute authorizing HIV testing of defendants convicted of certain drug paraphernalia offenses was constitutional under fourth amendment), appeal denied,146 Ill. 2d 636, 602 N.E.2d 461 (1992); *People* v. *Cook*, 143 App. Div. 2d 486, 487, 532 N.Y.S.2d 940 (court order requiring defendant who had been convicted of first degree rape to undergo testing for presence of acquired immunodeficiency syndrome (AIDS) upon request of victim was constitutional), appeal denied, 73 N.Y.2d 786, 533 N.E.2d 676, 536 N.Y.S.2d 746 (1988); *People* v. *J. G.*, 171 Misc. 2d 440, 451, 655 N.Y.S.2d 783 (1996) (New York statute requiring court to order HIV testing for defendants convicted of certain crimes was constitutional under fourth amendment); *State* v. *Handy*, 191 Vt. 311, 324, 44 A.3d 776 (2012) (Vermont statute allowing victim of sex offense to obtain court order for testing of convicted perpetrator for AIDS was constitutional); *In re Juveniles A, B, C, D, E*, 121 Wn. 2d 80, 98, 847 P.2d 455 (1993) (Washington statute mandating HIV testing for all defendants convicted of certain offenses was constitutional under fourth amendment); cf. *Walker* v. *Sumner*, 917 F.2d 382, 387–88 (9th Cir. 1990) (District Court improperly granted defendants' motion for summary judgment on plaintiff's claim that prison directive ordering mandatory HIV testing of all inmates was unconstitutional when defendants failed to present evidence to establish purpose of testing or that results would be used to further legitimate penological end).

State *v.* Bemer

ceration changes the relative weight accorded [to the interests of the government and the defendant]''), cert. denied, 493 U.S. 1059, 110 S. Ct. 871, 107 L. Ed. 2d 954 (1990); *People* v. *Adams*, 149 Ill. 2d 331, 348, 59 N.E.2d 574 (1992) (Illinois statute was constitutional because it ''operate[d] only at that point in the proceedings when a defendant no longer enjoys a presumption of innocence but instead stands at the threshold of incarceration, probation, or other significant curtailment of personal freedom'').

Although another case relied on by state, *United States* v. *Ward*, supra, 131 F.3d 335, does involve HIV testing, it is distinguishable because, in *Ward*, the federal statute authorizing HIV testing for defendants charged with certain crimes required victims seeking such testing to demonstrate that ''the test would provide information necessary for [the] health of the victim of the alleged offense . . . .'' (Internal quotation marks omitted.) Id., 339 n.2, quoting 42 U.S.C. § 14011 (b) (2) (1994). The very question before us in the present case is whether the state constitution requires such a finding before HIV testing may be ordered pursuant to § 54-102a (b).

Finally, for the following reasons, we are not persuaded by the reasoning of cases holding that the state has a compelling interest in protecting the health interests of victims that, *under all circumstances*, justifies suspicionless HIV testing of a defendant charged with certain sexual offenses.[28] In *State in the Interest of J.*

_____

[28] We express no opinion as to whether the state may have a significant interest in preventing the spread of HIV in prison populations that outweighs the diminished expectation of privacy of *convicted* defendants. See, e.g., *Dunn* v. *White*, supra, 880 F.2d 1195 (''[t]he prison's interest in responding to the threat of AIDS, or any contagious disease occurring in prison, is obviously strong''); *Harris* v. *Thigpen*, 727 F. Supp. 1564, 1572 (M.D. Ala. 1990) (''the [s]tate's interest in preventing the spread of [AIDS] among prison inmates and prison officials . . . amounts to a controlling [s]tate interest''), vacated in part on other grounds, 941 F.2d 1495 (11th Cir. 1991); *People* v. *Adams*, supra, 149 Ill. 2d 346 (''the purpose of the HIV testing statute [was]

State *v.* Bemer

*G.*, 151 N.J. 565, 701 A.2d 1260 (1997), the court noted that the accused juveniles had presented undisputed and unanimous expert testimony that "there would be no medical benefit to the victim, in either treatment or diagnosis, from testing the accused or convicted offender. In [the] view [of the expert witnesses presented by the juveniles], the only appropriate course is for the victim to undergo HIV testing." Id., 583. The court then observed that there was authority for the proposition that, *during the period immediately following the victim's potential exposure to HIV*, testing of the defendant could be useful in determining whether the victim should begin or continue prophylactic treatment; id., 584–85; and could provide psychological benefits to the victim. See id., 586 ("[*i*]*n those cases of sexual assault* [*in which*] *the accused is apprehended relatively soon after the assault*, involuntary testing, with appropriate due process and confidentiality protections for the accused, could mitigate one of the primary ongoing harms of the assault, the survivor's fear and uncertainty about the risk of contracting HIV" (emphasis added; internal quotation marks omitted)). The court ultimately concluded that the New Jersey HIV testing statute was reasonable, and therefore constitutional, as applied to the accused juveniles, despite the fact that they had been charged in 1994 and the case was not decided until 1997.[29] See id., 571, 588–90, 593–94. In our

to protect public health by preventing the spread of AIDS among members of the community"); *In re Juveniles A, B, C, D, E*, 121 Wn. 2d 80, 94, 847 P.2d 455 (1993) ("the [s]tate has a compelling interest in combating the spread of AIDS" by convicted defendant).

[29] See *Johnetta J.* v. *Municipal Court*, supra, 218 Cal. App. 3d 1280–81 ("The experts suggest that a bitten officer would be well advised to have a blood test for clearer information, *but HIV antibodies generally would not develop for three to six months after the bite*. [The HIV testing statute] provides a *prompt* mechanism to obtain some information pertinent to the officer's health, and therefore to the governmental special need." (Emphasis added.)); *Adams* v. *State*, 269 Ga. 405, 409, 498 S.E.2d 268 (1998) (same). Despite recognizing the time limitations on the usefulness of testing defendants for HIV, the courts in both *Johnetta J.* and *Adams* found the HIV testing statutes under review to be constitutional without any limitation on

State *v.* Bemer

view, however, the fact that testing the victim does not yield useful medical information during the several months immediately following potential exposure establishes only that there is medical utility in testing the defendant for HIV *during that period.*[30]

Indeed, a number of the courts that have upheld the constitutionality of nonconsensual HIV testing statutes nevertheless have expressly recognized that, when HIV testing of the victim would yield useful information, testing the defendant has little value. For example, although the court in *Johnetta J.* v. *Municipal Court*, supra, 218 Cal. App. 3d 1285, concluded that the California statute authorizing HIV testing was constitutional, the court questioned the wisdom of the statute in light of expert testimony "that the only really effective means of determining HIV infection is for the [potentially

their application. See *Johnetta J.* v. *Municipal Court*, supra, 1285; *Adams* v. *State*, supra, 409–10.

A number of courts that have rejected constitutional challenges to statutes requiring HIV testing of defendants who have been *convicted* of certain crimes have also relied on the court's statement in *Johnetta J.* that HIV testing of defendants can be medically useful and can provide psychological benefits to victims; see *Johnetta J.* v. *Municipal Court*, supra, 218 Cal. App. 3d 1280–81; apparently without recognizing that that observation pertained to the period in which testing the victim would not yield useful results. See *People* v. *J. G.*, 171 Misc. 2d 440, 450, 655 N.Y.S.2d 783 (1996); *State* v. *Handy*, 191 Vt. 311, 324, 44 A.3d 776 (2012); *In re Juveniles A, B, C, D, E*, 121 Wn. 2d 80, 93–95, 847 P.2d 455 (1993).

[30] We note that, in *Government of the Virgin Islands* v. *Roberts*, 756 F. Supp. 898 (D.V.I. 1991), the court noted that, "[f]or up to a year after the attack and perhaps longer . . . a rape victim cannot conclude from her own negative HIV test results that her assailant did not expose her to the virus or that she is not infected and therefore capable of transmitting HIV to others." Id., 903. The court concluded from this fact that "there is considerable medical utility in examining the blood of the putative source of HIV infection, even though the results are not dispositive." (Internal quotation marks omitted.) Id. Accordingly, the court found the court order for HIV testing at issue to be constitutional. Id., 904. It bears emphasis, however, that the assault in *Roberts* took place on October 29, 1990, and the testing order was issued on January 18, 1991; id., 899, 904; well within the period that testing of the defendant could provide results useful to the victim.

State *v.* Bemer

infected] concerned public safety employees to undergo their own tests.'' Id. Similarly, even though the court in *State* v. *Handy*, 191 Vt. 311, 44 A.3d 776 (2012), determined that the Vermont statute at issue, which required certain convicted defendants to submit to HIV testing, was reasonable; see id., 324; it observed that, when testing is not done during the ''latency period during which the victim's own testing might not yet reveal the presence of the virus . . . neither a negative nor a positive result from the offender's testing would appear to have any value for the victim. Moreover, any positive test result from the offender would have limited value for the additional reasons that the tests do not indicate when the virus was [acquired] and that the chances of passing the virus . . . to a sexual assault victim are very small. Indeed, even those who testified in support of testing offenders acknowledged that such testing provided little or no medically useful information for victims of sexual crimes.'' Id., 322; see also id., 321–22 (physician testified before legislative committee considering mandatory HIV testing legislation that ''testing sex offenders following conviction offered no medical benefit for victims because health care issues need to be addressed as soon after the sexual assault as possible and, given the normal lag time between the commission of the crime and conviction, the victims will have or should have already been tested themselves for sexually transmitted diseases''); cf. *People* v. *J. G.*, 171 Misc. 2d 440, 450, 655 N.Y.S.2d 783 (1996) (court tended to agree with expert who testified that, when more than two and one-half years have passed since assault, ''the only reliable test is one [that] would be performed on the victim herself and that a test on the defendant at such a late date does not have any medical utility''); *State* v. *Handy*, supra, 323 (''[S]exual assault victims do not necessarily consider the issue of testing offenders in a logical way as perceived by nonvictims.

State *v.* Bemer

While recognizing that testing victims is the only way to determine definitively whether they have contracted an infectious sexual disease, and in particular [HIV] . . . victims want the peace of mind that would result from also testing the perpetrator and . . . they feel further violated if their attacker[s] [refuse] to submit to the testing of bodily fluids forced [on] them during a sexual assault.''). In light of the questionable benefits of testing a defendant for HIV when testing the victim will yield reliable results, we are not persuaded by these cases that the special needs doctrine justifies suspicionless testing during that period.

The sixth prong of *Geisler*, contemporary understandings of applicable economic and sociological norms and relevant public policies in this state, bolsters this conclusion. Section 54-102a (b) was the codification of Spec. Sess. P.A. 94-6, § 27. The bill as originally proposed contained the following provision: "It is the policy of the state of Connecticut that testing for HIV or AIDS status shall be the voluntary act of the person on whom the test is performed, and that the results of such tests shall be disclosed only to the subject of the test. The preferred procedure for determining HIV/AIDS status of sexual assault victims is that the victim should be tested. This act constitutes an exception to that policy for the sole purpose of complying with the requirements of the federal Drug Control and System Improvement Formula Grant Program . . . .''[31] Substi-

---

[31] Under the federal Drug Control and System Improvement Formula Grant Program, the director of the federal Bureau of Justice Assistance in the United States Department of Justice was "authorized to make grants to states to enable them to enforce state and local laws that establish offenses similar to those in the Controlled Substances Act (21 U.S.C. § 801 et seq.) and to improve how the criminal justice system functions with respect to violent crime and serious offenders." Office of Legislative Research, Bill Analysis, Substitute House Bill No. 5790, 1994 Sess. The director was authorized to deny participating states 10 percent of their authorized funding if they did not enact laws authorizing the testing of defendants convicted of certain sexual offenses to undergo HIV testing. Id.

tute House Bill No. 5790, 1994 Sess., § 1. Representative Ellen Scalettar stated that this provision expressed the current policy of the state; 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7630; and that it was intended to "clarif[y] that no challenge can be brought to the current practices based [on] the new language in this statute which seems to express a contrary policy . . . ." Id., p. 7637. Representative Dale W. Radcliffe expressed concern, however, that, if state policy changed in the future, the provision would make it difficult to implement the new policy. Id., pp. 7630–33; see also id., p. 7637, remarks of Representative Radcliffe (policy provision might "tie the hands of those who have to implement HIV testing . . . who may wish to respond to conditions that we may not be able to foresee at this time"). Representative Radcliffe's view ultimately prevailed, and the provision was deleted. See House Amendment Schedule B to Substitute House Bill No. 5790, 1994 Sess. (passed May 4, 1994); 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7638.

As is clear from the debate on the proposed legislation, however, the policy set forth in the deleted provision reflected the current views of most legislators, at least with respect to testing the defendant during the period when testing the victim would provide useful results. Representative Norma Gyle stated that "none of us wanted this specific policy to allow victims to ask whether . . . they could have their assailant tested for HIV because there is a window that says that if someone is HIV positive, they may not test positive for quite some time and therefore the victim could get a false sense of security. . . . That's why we were reluctant to put this legislation into place." 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7626. Arguing in favor of the provision authorizing HIV testing for defendants who have been charged with certain offenses, Representative Farr stated that "[it] doesn't do an awful lot of good for the victim to find out a year after the assault that the

State *v.* Bemer

individual had AIDS. Chances are by then that the victim is going to know whether [HIV] has been transmitted.'' Id., pp. 7639–40. Representative Richard D. Tulisano opposed the proposed provision on the ground that ''the mere fact [that] a negative or positive comes up on the offender is no indication of whether . . . the victim will have a negative or a positive reading, and even if in fact there is a negative reading after [there is a] positive on the offender . . . does not mean because of the latency of the disease, it could not occur again in the future, and since our issues are to protect the victims of sexual assault the best we can, whatever resources we have ought to be . . . given to them so they can be retested.'' Id., pp. 7648–49. Representative Lenny T. Winkler opposed the provision because a negative test might give a ''false sense of security . . . .'' Id., p. 7650; see also id., p. 7664, remarks of Representative Scalettar (''the information that would be gained from testing upon conviction is not deemed to be information that would be helpful to the victim of the crime''); id., p. 7668, remarks of Representative Andrea L. Stillman (opposing proposed legislation because it could give victims false sense of security).

In addition, several groups providing services and support to victims of sexual assault opposed the proposed legislation mandating HIV testing of convicted offenders on the ground that testing the defendant generally provides little benefit to the victim. The Connecticut Sexual Assault Crisis Services, Inc., submitted documentation opposing the proposed legislation because ''[i]t [could] take up to two years for an offender to be convicted. A victim who is concerned about the possibility of HIV transmission needs information about her HIV status as quickly as possible and should be tested herself. Our concern is that the victim might not take necessary safety precautions in the interim between the assault and the testing of the convicted

State *v.* Bemer

offender.'' Conn. Joint Standing Committee Hearings, supra, p. 1577. Connecticut Sexual Assault Crisis Services, Inc., submitted a memorandum opposing the proposed legislation ''because quite simply it does not help victims of sexual assault, and because it misleads victims into believing that testing offenders will give them useful information. Having been misled, victims may not institute safe sex practices and may unknowingly make decisions [that] are deleterious to their health. If the goal of HIV testing is to give medical information or psychological reassurance to the survivor that she was not infected, then the survivor, not the offender, should be offered testing.'' Id., p. 1578. The Department of Public Health and Addiction Services submitted a memorandum providing that ''[l]egislators should be aware that this bill will not provide much help to women who are sexually assaulted. Because of the frequently long delay between the sexual assault and the [conviction] of the offender, a woman will be able to get her own test result before that of the perpetrator. In any case, the victim will need to [be] counseled and tested for HIV and other [sexually transmitted diseases] to determine whether . . . transmission occurred and to obtain medical care. This is because a negative test [of] the perpetrator cannot ensure that he was not HIV infected, since it generally takes about six months after a [newly acquired] infection for the test result to read positive. In addition, a positive test result does not mean that the woman was infected. She still must be tested herself.'' Id., p. 1581. The Susan B. Anthony Project Sexual Assault Crisis Services opposed the proposed legislation because testing the defendant long after a sexual assault, by which time ''[t]he victim should have . . . received information on anonymous testing, been tested (at least once) and practiced safety precautions with partners and family until two HIV tests show negative results,'' is ''pointless.'' Id., p. 1582. In addition, a

State *v.* Bemer

defendant's positive test result "could lead to unnecessary anxiety on the part of the victim (the chance of contracting HIV from one sexual contact is very low), as well as wrong assumptions that the victim is also HIV positive . . . ." Id. The Connecticut Chapter of the National Organization for Women opposed the legislation because, "[i]f a victim is concerned with the possibilities [of] HIV infection she should not wait until the offender is convicted . . . but seek confidential testing immediately and within [six to eight] months after the assault." Id., p. 1583.

Indeed, the legislative history of Spec. Sess. P.A. 94-6, § 27, reveals that the primary purpose of the legislation authorizing HIV testing of defendants charged or convicted of certain sexual offenses was not to provide useful information to the victims of sexual assault, but to ensure that the state would not lose funding under the federal Drug Control and System Improvement Formula Grant Program. See 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7626, remarks of Representative Gyle (reason that legislature wanted to pass legislation was to satisfy requirements for receiving federal funding); see also id., p. 7622, remarks of Representative Scalettar ("the legislation was not proposed due to . . . a change in the policy of the state, but only to allow us to recapture those federal funds"); id., p. 7639, remarks of Representative Farr ("the underlying bill is required by federal law"); id., p. 7647, remarks of Representative Gyle ("[w]e're [enacting the legislation] because the federal government is blackmailing us into doing it"); id., pp. 7664–65, remarks of Representative Scalettar (indicating that proposed legislation would not have been introduced but for federal funding issue because testing is not beneficial to victims); id., p. 7665, remarks of Representative Scalettar (avoiding loss of federal funding "is the sole reason for the bill"); Conn. Joint Standing Committee Hearings, supra, p. 1579, written testimony

State *v.* Bemer

of Thomas A. Siconolfi, Director, Policy Development and Planning Division of Office of Policy and Management (enacting legislation "would ensure [s]tate compliance with a federal mandate concerning the [federal] Drug Control and System Improvement . . . block grant and prevent the loss of 10 percent of Connecticut's share of the grant in the next fiscal year"); id., p. 1581, written testimony of Department of Public Health and Addiction Services (giving "reluctant support" to proposed legislation, even though it would provide little benefit to victims, because, "[i]f it is not passed, Connecticut will lose criminal enforcement funds").

We agree with the Supreme Court of Vermont that, "[i]f retaining federal funding were the sole governmental interest supporting the challenged portion of the [Vermont] statute, then the constitutionality of the law would be suspect because there would be no nexus between the law's intrusion on even the diminished privacy interest . . . and the information obtained from that intrusion." *State* v. *Handy*, supra, 191 Vt. 322–23. The state's interest in obtaining funding, standing alone and in the absence of any important special need for specific information, cannot trump an individual's constitutional right to be free from suspicionless searches. To put it more directly, a state cannot lawfully be induced by a payment from the federal government to engage in conduct that violates the constitutional rights of its citizenry. We recognize, however, that a number of legislators believed that, at least within the time period immediately following a sexual assault, when testing the victim would not yield any useful information, testing the defendant could provide a practical benefit to the victim. See 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7651, remarks of Representative Farr ("[T]he purpose of the test is to give some peace of mind to women who are rape victims. . . . I presume that the overwhelming majority of accused in rape cases do not

State *v.* Bemer

have [HIV] and that when a woman wants to know whether . . . the accused who had raped her had [HIV], [and] that if she finds out that . . . he doesn't test positive for [HIV], she may have some peace of mind. Admittedly, it isn't perfect because that individual may have [HIV] that . . . doesn't yet show up on testing, but the whole purpose of the amendment is quite simple. It's to give some peace of mind to some [victims].''); id., p. 7652, remarks of Representative Robert R. Simmons (''the main purpose . . . of this amendment [allowing the testing of a defendant who has been charged] is to provide some comfort or some protection to the victim''); id., p. 7659, remarks of Representative Ward (arguing that victims are entitled to information about health status of persons who assaulted them and are capable of making intelligent decisions regarding that information); id., p. 7670, remarks of Representative Alan M. Kyle (arguing that legislation would operate to ''dispel one of the very major fears that would be a portion of that psychological trauma [namely] whether . . . at some time after the incubation period of this very horrible disease, [the victim] may wind up carrying [HIV]''); id., p. 7672, remarks of Representative Kyle (testing may relieve victim of fear, even if results are not definitive).

On the basis of the foregoing, we conclude that the granting of a motion for HIV testing pursuant to § 54-102a (b) based solely on a finding that a defendant has been charged with an offense enumerated in a statute that proscribes a sexual act violates the defendant's right to be free from unreasonable searches under article first, § 7, of the Connecticut constitution. The legislative history of § 54-102a (b) and cases from other jurisdictions considering the constitutionality of similar statutes make it clear that, in many cases, such testing would provide no real medical benefit to the victim. When that is the case, the proffered special need is not

State *v.* Bemer

sufficient to override a defendant's recognized privacy interest. See, e.g., *Chandler* v. *Miller*, supra, 520 U.S. 318. Moreover, requiring a showing of the practical usefulness of HIV testing to the victim at a hearing on the motion for such testing would in no way frustrate the legitimate purpose of the statute. See, e.g., *Skinner* v. *Railway Labor Executives' Assn.*, supra, 489 U.S. 619. Indeed, doing so would advance the state's public policy that HIV testing should be consensual unless it is necessary to protect the health of another. See General Statutes § 19a-582 (d) (8). Accordingly, we conclude that, in cases in which testing would provide no real practical benefit to the victim, the state's interest in requiring testing does not outweigh the defendant's reasonable privacy expectations. Cf. *National Treasury Employees Union* v. *Von Raab*, supra, 489 U.S. 665–66.

We also conclude, therefore, that we must place an interpretive gloss on § 54-102a (b) to render it compatible with the requirements of article first, § 7. See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 805–806, 640 A.2d 986 (1994) ("[W]e may . . . add [an] interpretive gloss to a challenged statute in order to render it constitutional. In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.)). Specifically, we hold that, before ordering testing pursuant to § 54-102a (b), a court must first make a finding that such testing would provide useful, practical information to a victim that cannot reasonably be obtained otherwise. In making this determination, the court ordinarily may presume that testing during the six month period immediately following the alleged assault, when testing the victim for HIV might not yield useful information, would be of practical benefit to the victim.

In reaching this conclusion, we are mindful that, even after the six month period immediately following the

State *v.* Bemer

assault has passed, a defendant's negative test result could establish that the defendant has not exposed the victim to HIV. At that point, however, the defendant's privacy interest ordinarily would outweigh any benefit to the victim because the burden of self-testing on the victim generally would be slight, and, unlike the information obtained from testing the defendant, the information obtained from testing the victim would be definitive. If the victim can establish, however, that, for some reason, the burden of undergoing a test would not be slight and, for example, that a negative test result from the defendant would be definitive of the victim's HIV status because the defendant was the exclusive source of any potential infection, a testing order could be warranted. The court also should consider other relevant facts and circumstances in determining whether testing would provide useful, practical information to the victim after the six month period immediately following the assault has expired.[32]

The foregoing reasoning applies equally to an order for an examination for sexually transmitted diseases pursuant to § 54-102a (a), and, consequently, the same showing that must be made prior to the issuance of an order for testing under § 54-102a (b) also must be made prior to the issuance of an order for an examination under § 54-102a (a). Because of the differences between sexually transmitted diseases and HIV, however, including the fact § 54-102a (a) provides for an examination and § 54-102a (b) provides for testing, we acknowledge that different considerations may well be relevant in

_____

[32] We recognize, of course, that it has been more than four years since the offending sexual contact occurred and, therefore, that it is highly unlikely that the victims can demonstrate that, at this late date, an order under § 54-102a (b) would result in the discovery of useful, practical information that they could not reasonably obtain by self-examination or testing. We nevertheless remand the case for a new hearing because of the possibility, however remote, of circumstances, unknown to us, that might justify such an order.

State *v.* Bemer

determining whether that standard has been met under the two statutory subsections.

We therefore conclude that, in the absence of any evidence that an examination under § 54-102a (a) would provide a real practical benefit to the victim that cannot reasonably be obtained in another manner, an order for such an examination would also violate article first, § 7. Thus, a person seeking an order pursuant to § 54-102a (a) must make a showing that an examination would provide useful, practical information to the victim that cannot reasonably be obtained in another manner. Because the record before us contains no information regarding the incubation periods for sexually transmitted diseases or other information that might assist us in providing guidance as to when an examination under § 54-102a (a) would be of practical benefit, we leave the determination as to whether an order for such an examination is warranted to the informed discretion of the trial court.[33]

The state contends that § 54-102a (b) as written satisfies the state constitution because "the government has a compelling interest in testing in furtherance of protecting the health and welfare of its citizens by stemming the spread of HIV/AIDS. Identifying infected individuals allows them to receive treatment for their

---

[33] We note that when, as in the present case, we have determined that a defendant is entitled to protection under the state constitution, we ordinarily would have no need to address any parallel claim raised under the federal constitution. In the present case, however, the relief that we have afforded the defendant under the state constitution is not the full relief that he has sought under either the state or federal constitution. This is so because the standard that the defendant claims is applicable to an order issued pursuant to § 54-102a is considerably more demanding than the standard that we have concluded is required under the state constitution. Consequently, although highly unlikely, it is at least theoretically possible that, for purposes of § 54-102a, the defendant is entitled to greater protection under the federal constitution than the protection afforded under the state constitution. It is clear, from our review of the relevant federal precedent, however, that, whatever the defendant's rights may be under the fourth amendment, in no event are they greater than his rights under the state constitution.

State *v.* Bemer

individual health needs and education for changing behaviors and for preventing infection of others. This identification also permits public health officials, when necessary, to inform partners of the tested individual who, in turn, can undergo testing and, if necessary, treatment.'' There is no evidence in the record, however, that individuals accused of sexual assault are at greater risk of carrying HIV than members of the general public. Thus, even if we were to assume that the statute was intended to protect not only victims, but also the defendant and the public at large, there is no connection between the diminished privacy expectations of a defendant charged with sexual assault, which derive from the defendant's alleged conduct toward the victim, and the state's desire for information about the defendant's HIV status in order to protect the defendant himself or the public. See, e.g., *State* v. *Handy*, supra, 191 Vt. 322–23 (Vermont's HIV testing statute would be unconstitutional if there were ''no nexus between the law's intrusion on even the diminished privacy interest [of the defendant] and the information obtained from that intrusion''); *In re Juveniles A*, *B*, *C*, *D*, *E*, 121 Wn. 2d 80, 104, 105–106, 847 P.2d 455 (1993) (Utter, J., concurring in part, dissenting in part) (arguing that state's interest in combating spread of AIDS did not justify testing of convicted defendant because same rationale would apply to ''*any* individual whether charged and convicted or not'' and that ''[t]he [s]tate's interest in assisting a sexual offender who is potentially HIV positive is no greater than its interest in assisting any other sort of criminal offender'' (emphasis in original)); see also *Chandler* v. *Miller*, supra, 520 U.S. 321, 322 (suspicionless drug testing of candidates for state office was not reasonable when Georgia asserted ''no evidence of a drug problem among [its] elected officials'' and need established was merely ''symbolic''). In other words, when a defendant has been charged with

State *v.* Bemer

forcibly exposing a victim to his bodily fluids against the victim's will, he cannot reasonably complain if the victim seeks private information about any diseases to which he or she may have been involuntarily exposed, even if the risk that the defendant is infected is no greater than the risk for a member of the general public. We can perceive no reason, however, why a defendant should have a diminished expectation of privacy with respect to information required to protect his own health or the health of individuals who have consensually engaged in intimate contact with him such as to warrant suspicionless testing. If those individuals have reason to believe that the defendant exposed them to HIV and self-testing would not yield useful results, they may seek a testing order pursuant to § 19a-582 (d) (8). Accordingly, we reject this claim.

In summary, we conclude that § 54-102a (b) does not incorporate the standard set forth in § 19a-582 (d) (8). We also conclude, however, that, under article first, § 7, of the state constitution, the trial court was required to make a finding that an examination or testing or both would provide useful, practical information to the victim that could not reasonably be obtained otherwise, before ordering any such examination or testing in accordance with § 54-102a (a) and (b), respectively. It is clear that the trial court did not apply this standard. Because the state and the victims were not on notice that they were required to satisfy this requirement, the case must be remanded for a new hearing on their motions under § 54-102a.

The trial court's order directing the defendant to submit to an examination for sexually transmitted diseases pursuant to § 54-102 (a) and for HIV testing pursuant to § 54-102 (b) is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

State *v.* Bemer

In this opinion ROBINSON, C. J., and MULLINS, KAHN and VERTEFEUILLE, Js., concurred.

McDONALD, J., with whom D'AURIA, J., joins, concurring in the judgment. I agree with the majority that the trial court's order is an appealable final judgment. I also agree with the majority that the trial court's judgment granting the motions of the state and the victims that the defendant, Bruce John Bemer, be required to submit to human immunodeficiency virus (HIV) testing pursuant to General Statutes § 54-102a (b) and an examination for sexually transmitted diseases pursuant to § 54-102a (a)[1] must be reversed, and the case remanded to the trial court for further proceedings. I write separately, however, because I strongly disagree with the majority's conclusion that court-ordered HIV testing under § 54-102a (b) does not incorporate the rigorous standard and significant procedural safeguards that the legislature adopted and codified in General Statutes § 19a-582 (d) (8). Before any individual—even a criminal defendant—is forced by the state, against his will and without his consent, to submit to medical testing for HIV, both that high standard and those important safeguards must be adhered to in order for the testing to be lawful.

In my view, when the court was requested, before trial or conviction, to deploy the force of law against the defendant and to order him to be subjected to HIV testing, § 19a-582 (d) (8) required the court, among other things, to find that there is "a clear and imminent danger to the public health or the health of a person and that the person [requesting the testing] has demonstrated a compelling need for the HIV-related test result

[1] Although § 54-102a (a) was the subject of a technical amendment in 2018; see Public Acts 2018, No. 18-168, § 29; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

State *v.* Bemer

that cannot be accommodated by other means.'' General Statutes § 19a-582 (d) (8) (A). Because I conclude that well known principles of statutory construction reveal that the standard set forth in § 19a-582 (d) (8) is incorporated into court-ordered HIV testing under § 54-102a (b)—and because it is well settled that this court has a duty to construe statutes, whenever possible, to avoid the type of constitutional infirmities the majority has discerned in this case—I respectfully concur.

I agree with the majority's recitation of the facts. Accordingly, I turn to the defendant's claim that the trial court abused its discretion in ordering HIV testing pursuant to § 54-102a (b)[2] because the court did not adhere to the requirements of § 19a-582[3] that there first

[2] General Statutes § 54-102a (b) provides in relevant part: ''Notwithstanding the provisions of section 19a-582, the court before which is pending any case involving a violation of section 53-21 or any provision of sections 53a-65 to 53a-89, inclusive, that involved a sexual act, as defined in section 54-102b, may, before final disposition of such case, order the testing of the accused person . . . for the presence of the etiologic agent for acquired immune deficiency syndrome or human immunodeficiency virus . . . . If the victim of the offense requests that the accused person . . . be tested, the court may order the testing of the accused person . . . in accordance with this subsection and the results of such test may be disclosed to the victim. The provisions of sections 19a-581 to 19a-585, inclusive, and section 19a-590, except any provision requiring the subject of an HIV-related test to provide informed consent prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection, shall apply to a test ordered under this subsection and the disclosure of the results of such test.''

[3] General Statutes § 19a-582 provides in relevant part: ''(a) Except as required pursuant to section 19a-586, a person who has provided general consent as described in this section for the performance of medical procedures and tests is not required to also sign or be presented with a specific informed consent form relating to medical procedures or tests to determine human immunodeficiency virus infection or antibodies to human immunodeficiency virus. General consent shall include instruction to the patient that: (1) As part of the medical procedures or tests, the patient may be tested for human immunodeficiency virus, and (2) such testing is voluntary and that the patient can choose not to be tested for human immunodeficiency virus or antibodies to human immunodeficiency virus. General consent that includes HIV-related testing shall be obtained without undue inducement

State *v.* Bemer

must be a finding of "a clear and imminent danger to
the public health or the health of a person and that the
person has demonstrated a compelling need for the
HIV-related test result that cannot be accommodated
by other means." General Statutes § 19a-582 (d) (8) (A).
As the defendant points out, the state does not claim
that the trial court made any such finding. Rather, the
state contends that § 54-102a (b) does not incorporate
the standard set forth in § 19a-582 (d) (8) but, instead,
broadly authorizes the trial court to order HIV testing
when, as here, the defendant has been charged with
committing an offense enumerated in § 54-102a (b) that
involved a sexual act.

As the majority correctly notes, whether § 54-102a
(b) incorporates the standard contained in § 19a-582

___

or any element of compulsion, fraud, deceit, duress or other form of con-
straint or coercion. If a patient declines an HIV-related test, such decision
by the patient shall be documented in the medical record. The consent of
a parent or guardian shall not be a prerequisite to testing of a minor. The
laboratory shall report the test result to the person who orders the perfor-
mance of the test.

\* \* \*

"(d) The provisions of this section shall not apply to the performance of
an HIV-related test:

\* \* \*

"(8) Under a court order that is issued in compliance with the following
provisions: (A) No court of this state shall issue such order unless the court
finds a clear and imminent danger to the public health or the health of a
person and that the person has demonstrated a compelling need for the
HIV-related test result that cannot be accommodated by other means. In
assessing compelling need, the court shall weigh the need for a test result
against the privacy interests of the test subject and the public interest that
may be disserved by involuntary testing, (B) pleadings pertaining to the
request for an involuntary test shall substitute a pseudonym for the true
name of the subject to be tested. The disclosure to the parties of the subject's
true name shall be communicated confidentially, in documents not filed
with the court, (C) before granting any such order, the court shall provide
the individual on whom a test result is being sought with notice and a
reasonable opportunity to participate in the proceeding if he or she is not
already a party, (D) court proceedings as to involuntary testing shall be
conducted in camera unless the subject of the test agrees to a hearing in
open court or unless the court determines that a public hearing is necessary
to the public interest and the proper administration of justice . . . ."

State *v.* Bemer

(d) (8) is a question of statutory interpretation over which our review is plenary. See part II of the majority opinion; see also, e.g., *Smith* v. *Rudolph*, 330 Conn. 138, 142–43, 191 A.3d 992 (2018). This court reviews §§ 54-102a (b) and 19a-582 (d) (8) in accordance with General Statutes § 1-2z and our familiar principles of statutory construction. See, e.g., *Smith* v. *Rudolph*, supra, 143. I am mindful that "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 198, 3 A.3d 56 (2010).

I begin with § 54-102a (b), which provides in relevant part that, "[n]otwithstanding the provisions of section 19a-582," the trial court may, in specified criminal cases, including this one, order HIV testing of the defendant before the disposition of the case. Such testing is also subject to the following condition: "The provisions of *sections 19a-581 to 19a-585, inclusive,* and section 19a-590, *except any provision requiring the subject of an HIV-related test to provide informed consent prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection, shall apply* to a test ordered under this subsection and the disclosure of the results of such test." (Emphasis added.) General Statutes § 54-102a (b).

Subsection (a) of § 19a-582 sets forth a general rule requiring an individual's informed consent before any HIV related testing. Subsection (d), however, provides several circumstances under which an individual's

State *v.* Bemer

informed consent is not required before HIV related testing is performed.[4] Relevant to this case, subdivision (8) of § 19a-582 (d) allows another person to request that a court order involuntary testing of an individual when it has found that there is "a clear and imminent danger to the public health or the health of a person and that the person has demonstrated a compelling need for the HIV-related test result that cannot be accommodated by other means." General Statutes § 19a-582 (d) (8) (A). Subdivision (8) also provides guidance to the trial court in assessing whether there is a compelling need for the HIV test result. Namely, it directs that, "[i]n assessing compelling need, the court shall weigh the need for a test result against the privacy interests of the test subject and the public interest that may be disserved by involuntary testing . . . ." General Statutes § 19a-582 (d) (8) (A).

As the majority explains, the issue in this case "stems from the parties' dispute over the proper reading of the '[n]otwithstanding the provisions of section 19a-582' language contained in the first sentence of § 54-102a (b) in light of the final sentence of that subsection, providing that a range of statutes, including § 19a-582, *applies* to an HIV testing order issued under § 54-102a (b), '*except any provision requiring the subject of an HIV-related test to provide informed consent* prior to the performance of such test and any provision that would prohibit or limit the disclosure of the results of such test to the victim under this subsection . . . .' General Statutes § 54-102a (b)." (Emphasis added.) Part II of the majority opinion. The defendant contends that the only way to reconcile these two provisions is to construe the "[n]otwithstanding" clause to apply only

---

[4] Subsections (b) and (c) of § 19a-582 pertain to persons administering tests authorized under that section. Subsection (b) addresses limited liability for persons ordering a test without informed consent. Subsection (c) provides for counseling and referrals with the disclosure of test results.

State *v.* Bemer

to the informed consent requirement of subsection (a) of § 19a-582 and not to the various exceptions pursuant to which informed consent is not needed, as set forth in subsection (d) of § 19a-582. Thus, the defendant argues, subdivision (8) of § 19a-582 (d), which allows testing without consent only after the court finds a clear and imminent danger and a compelling need for the testing, is not excepted from the purview of § 54-102a (b). Therefore, in the defendant's view, the requirements of subdivision (8) of § 19a-582 (d) must be met prior to the issuance of an order for HIV testing under § 54-102a (b). The state disagrees and contends that, because both the first and third sentences of § 54-102a (b) explicitly or implicitly provide that § 19a-582 does not apply to orders issued pursuant to § 54-102a (b), the trial court was not required to adhere to the standard set forth in § 19a-582 (d) (8) prior to issuing its order.

I agree with the defendant that, when the three sentences that make up § 54-102a (b) are read together; see *Historic District Commission* v. *Hall*, 282 Conn. 672, 684, 923 A.2d 726 (2007) ("[l]egislative intent is not to be found in an isolated sentence; the whole statute must be considered" (internal quotation marks omitted)); the "[n]otwithstanding" language in § 54-102a (b) is properly understood to apply only to those aspects of § 19a-582 that would require the defendant to give his informed consent and any provision that would limit or prohibit the disclosure of the test results to the victims. All other aspects of § 19a-582, including the standard set forth in subsection (d) (8), are still applicable. See General Statutes § 54-102a (b) ("[t]he provisions of *sections 19a-581 to 19a-585, inclusive . . . shall apply* to a test ordered under this subsection" (emphasis added)). This is consistent with our well settled principle of statutory construction that "specific terms in a statute covering a given subject matter will prevail over the more general language of the same or another

State *v.* Bemer

statute that otherwise might be controlling.'' (Internal quotation marks omitted.) *Branford* v. *Santa Barbara*, 294 Conn. 803, 813, 988 A.2d 221 (2010). Here, the first sentence of § 54-102a (b) generally provides that, ''[n]otwithstanding the provisions of section 19a-582,'' the court may order testing. The final sentence of that statutory provision, however, clearly specifies that it is only those provisions requiring the defendant's informed consent or limiting disclosure that are excepted from the statute. Because § 19a-582 (d) (8) provides for court-ordered testing *without* the defendant's consent and does not limit the disclosure of test results to victims, it is not excepted from § 54-102a (b).

Construing the ''[n]otwithstanding the provisions of section 19a-582'' language in the first sentence of § 54-102a (b) to apply to the entirety of § 19a-582, as the majority does, denudes the last sentence of § 54-102a (b), which provides in relevant part that ''sections 19a-581 to 19a-585, *inclusive . . . shall apply*,'' of any meaning. (Emphasis added.) As discussed, the vitality of those statutory provisions, including § 19a-582, is limited only insofar as any provision within the range of those statutes requires informed consent or limits the disclosure of the test results to the victim. Nothing in § 54-102a (b) excises the imminent danger and compelling need statutory standard contained in § 19a-582 (d) (8). Moreover, of the five statutes specifically incorporated by reference in § 54-102a (b), which span approximately ten pages of our General Statutes, only § 19a-582—nay, one *subsection* of § 19a-582—deals with consent.[5] Because the legislature included § 19a-582 in the list of applicable statutes, it cannot be entirely read out of § 54-102a (b), as the majority concludes. Cf. *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426,

[5] In addition to General Statutes §§ 19a-581 through 19a-585, General Statutes § 19a-590 is also incorporated by reference in § 54-102a (b) and does not deal with consent.

State *v.* Bemer

433, 994 A.2d 1265 (2010) ("[I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.)).[6]

When the applicable statutory provisions are considered together, it is entirely consistent that § 54-102a (b) would provide for court-ordered HIV testing in criminal cases without the defendant's consent provided the court follows the standard and requirements set forth in § 19a-582 (d) (8). Put differently, § 19a-582 (d) (8) supplements and completes § 54-102a (b) by providing a legislatively considered and approved standard that must be met before a court may order a criminal defendant to involuntarily submit to HIV testing under § 54-102a (b). Without it, there would be no standard at

_____

[6] The majority nevertheless concludes, as the state contends, that, if § 54-102a (b) incorporates § 19a-582 (d) (8), § 54-102a (b) would be rendered superfluous. See part II of the majority opinion. I disagree. Although it is true that § 19a-582 (d) (8) preexisted § 54-102a (b), § 54-102a (b) gives victims standing in a criminal proceeding to request a court-ordered HIV test of the defendant that they would not otherwise have had. See General Statutes § 54-102a (b) ("[i]f the victim of the offense requests that the accused person . . . be tested, the court may order the testing of the accused person . . . in accordance with this subsection and the results of such test may be disclosed to the victim"). This provision is one of the very limited circumstances in which a victim has standing in the criminal context to assert his or her own interests. Indeed, we have held that victims do not have standing to assert their own constitutionally protected rights as victims in criminal proceedings when the defendant who perpetrated those crimes is being prosecuted. See, e.g., *State* v. *Gault*, 304 Conn. 330, 342–43, 39 A.3d 1105 (2012); see also, e.g., *State* v. *Skipwith*, 326 Conn. 512, 528, 165 A.3d 1211 (2017) (*McDonald, J.*, concurring in the judgment). But for the enactment of § 54-102a (b), the victim could not—as the victims here—rely on the state to seek the court's intervention. Instead, the victim would have to initiate a separate, civil action asserting a claim against the defendant, with all the attendant expenses, in order to seek a similar court order pursuant to § 19a-582 (d) (8).

State *v.* Bemer

all. We ought to hesitate, at some length, before we conclude that the legislature intentionally adopted a strict and rigorous standard for nonconsensual HIV testing that would apply in a civil, sexual assault action brought by a victim against a defendant but nevertheless chose to provide no standard at all for the exact same test in a criminal prosecution for the exact same sexual assault. Because §§ 54-102a (b) and 19a-582 (d) (8) can be reconciled with both statutes being given effect, we have an obligation to do so. Cf. *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, 293 Conn. 363, 377–78, 977 A.2d 650 (2009) (we attempt to reconcile conflicting statutes in manner that allows for their coexistence).

In addition to its conclusion that the compelling need and imminent harm requirements are inapplicable to court-ordered, involuntary HIV testing under § 54-102a (b), the majority's holding also jettisons the procedural safeguards contained in § 19a-582 (d) (8) (B) through (D). Specifically, these provisions provide privacy protections for the defendant; General Statutes § 19a-582 (d) (8) (B); afford the defendant notice and an opportunity to participate in the proceeding; General Statutes § 19a-582 (d) (8) (C); and provide that the proceedings surrounding the involuntary testing generally must be conducted in camera. General Statutes § 19a-582 (d) (8) (D). Thus, the majority's conclusion that § 19a-582 (d) (8) is inapplicable to HIV testing ordered pursuant to § 54-102a (b) leaves the trial court with no standard to apply or procedural safeguards to follow throughout the proceeding.

Moreover, a review of the broader statutory scheme provides further support for the conclusion that the requirements in § 19a-582 (d) (8) are applicable to an order issued pursuant to § 54-102a (b). General Statutes § 19a-583, which, without question, falls within the ambit of § 54-102a (b), provides guidance on the disclosure of HIV related information. Significantly, subdivi-

State *v.* Bemer

sion (10) of § 19a-583 (a) incorporates the same imminent danger and compelling need standard that is included in § 19a-582 (d) (8). Section 19a-583 provides in relevant part: ''(a) *No person who obtains confidential HIV-related information may disclose* or be compelled to disclose such information, except to the following:

\* \* \*

''(10) Any person allowed access to such information by a court order which is issued in compliance with the following provisions: (A) *No court of this state shall issue such order unless the court finds a clear and imminent danger to the public health or the health of a person and that the person has demonstrated a compelling need for the test results which cannot be accommodated by other means.* . . .'' (Emphasis added.) For example, under General Statutes § 54-102c, when a trial court orders an HIV test pursuant to § 54-102a, a victim may designate a health care provider to disclose the results to the victim. Whether the health care provider can disclose the results to the victim is, in turn, determined based on § 19a-583 (a) (10) because that provision sets the parameters for disclosure of HIV test results and is incorporated into § 54-102a. See General Statutes § 54-102a (b) (''[t]he provisions of sections 19a-581 to 19a-585 . . . shall apply''). Thus, in order for the victim's designated health care provider, or anyone else, to disclose the results of the HIV test to the victim, the provider must ensure that the same standard found in § 19a-582 (d) (8) has been satisfied. See General Statutes § 19a-583 (a) (10).

It would be a bizarre and unworkable result if a criminal trial court, guided by no meaningful standard, could order involuntary HIV tests when, simultaneously, the only way the results could legally be disclosed to the victim would be by ensuring that the imminent danger and compelling need requirements of § 19a-583 (a) (10)

State *v.* Bemer

had been employed by the trial court before it issued
the order. In other words, the court could order the
test, but the victim would not be able to lawfully obtain
the results.[7] I would not construe the statutory scheme
to create such a bizarre result. See, e.g., *Goldstar Medi-*
*cal Services, Inc.* v. *Dept. of Social Services*, 288 Conn.
790, 803, 955 A.2d 15 (2008) ("[i]n construing a statute,
common sense must be used and courts must assume
that a reasonable and rational result was intended"
(internal quotation marks omitted)).

The majority's construction of § 54-102a (b), which
renders the entirety of § 19a-582 inapplicable under
§ 54-102a, also leads to an inconsistency in the provision
of counseling services, which would be afforded to vic-
tims but not to criminal defendants who test positive
for HIV. Specifically, § 19a-582 (c) provides for certain
counseling services to a defendant, which are designed
to, among other things, provide the defendant with
assistance to obtain treatment and to notify sexual part-
ners. These critical counseling services would not be
available to defendants under the majority's construc-
tion of § 54-102a (b) because all of § 19a-582 is inapplica-
ble to HIV testing ordered under subsection (b) of § 54-
102a. Pursuant to § 54-102c, however, the victims would
be given such counseling services. Thus, the majority's
construction would result in victims receiving counsel-

_____

[7] I also note that, unlike in General Statutes § 54-102b, which specifically
provides that the results of an HIV test must be disclosed to the offender
who is tested after his conviction, there is nothing in the statutory scheme
in § 54-102a (b) that provides for the defendant to be notified of the results
of his involuntary HIV test taken while he has only been charged with a crime.
Compare General Statutes § 54-102b (a) ("court . . . shall . . . order . . .
that the results be disclosed to the victim and the offender") with General
Statutes § 54-102a (b) ("the results of such test may be disclosed to the
victim").

Although § 54-102b was the subject of a technical amendment in 2019;
see Public Acts 2019, No. 19-189, § 32; that amendment has no bearing on
the merits of this appeal. For convenience, we refer to the current revision
of the statute.

State *v.* Bemer

ing services but not defendants, who, naturally, should also be encouraged to obtain treatment and to notify their partners of their HIV status.[8] Indeed, this court has previously explained the importance of identifying individuals who are HIV positive in order to provide them with education and treatment. See, e.g., *Doe* v. *Marselle*, 236 Conn. 845, 852, 675 A.2d 835 (1996) ("[the requirements of chapter 368x of the General Statutes] relate principally to the areas of informed consent for HIV testing and confidential treatment of HIV-related information, and are *aimed at helping health care providers to identify those people with the disease, to treat them and to educate them*" (emphasis added)). This concern applies with equal force to both victims and defendants.

The majority, however, claims that § 54-102a (b), which pertains to HIV testing in pending criminal cases, and General Statutes § 54-102b, which pertains to HIV testing in cases following a defendant's conviction, are materially identical, such that § 19a-582 (d) (8) either applies to both provisions or to neither. See part II of the majority opinion. As a result, the majority asserts, under the defendant's construction of § 54-102a (b), the imminent harm and compelling need requirements of subdivision (8) of § 19a-582 (d) also apply to § 54-102b, when the defendant has been found guilty beyond a reasonable doubt. See id. The majority concludes that "[i]t simply is impossible to believe that the legislature would have imposed that same exacting standard when the state has already established that the victim was

---

[8] The majority asserts that the counseling services provided for by § 54-102c are "certain publicly available 'educational materials' and 'information' obtainable through the Department of Public Health, all of which a defendant, or his or her counsel, may readily obtain upon request." Footnote 16 of the majority opinion. The majority cites to no source of authority obligating the trial court to provide these services and information to the defendant. That the defendant may request it means little if there is no obligation for the trial court to provide it.

State *v.* Bemer

sexually assaulted by the defendant and in all other circumstances in which someone is prompted, for whatever reason, to seek an order requiring another person to submit to an HIV test.'' (Emphasis omitted.) Text accompanying footnote 16 of the majority opinion.

I respectfully disagree. I first note that, when an individual has been *charged* with certain offenses, § 54-102a (b) provides that the court ''may'' order the HIV testing, whereas, when an individual has been *convicted* of certain offenses, § 54-102b (a) provides that the court ''shall,'' at the victim's request, order HIV testing. It is logical that the trial court would be afforded discretion to order HIV testing when a defendant has only been charged with a crime but is directed to order the testing after the defendant has been convicted.

More important, I find it troubling that the majority construes § 54-102a (b) such that an individual who has not been convicted of a crime and enjoys the presumption of innocence may be subjected to involuntary testing based only on the fact that he was charged with one of the enumerated offenses. Contrary to the majority's conclusion that §§ 54-102a (b) and 54-102b are materially identical, such that subdivision (8) of § 19a-582 (d) either applies to both provisions or it applies to neither, § 54-102b is even clearer than § 54-102a (b) that the provisions of § 19a-582 (d) (8), which provide the standard for obtaining a court-ordered HIV test without the consent of the defendant, are also applicable to a test ordered for someone who has been convicted. Indeed, the issue in this case stems from the parties' dispute over the proper reading of the ''[n]otwithstanding the provisions of section 19a-582'' language contained in the first sentence of § 54-102a (b). There is no such language in § 54-102b. Rather, § 54-102b provides only that ''[t]he provisions of sections 19a-581 to 19a-585, inclusive, and section 19a-590, except the requirement that the subject of an HIV-related test provide informed

State *v.* Bemer

consent prior to the performance of such test, shall apply to a test ordered under this section.'' General Statutes § 54-102b (b). There can be no question that the rigorous standard and procedural safeguards contained in § 19a-582 (d) (8) apply to involuntary HIV testing of a convicted person. It would be illogical to conclude that the more stringent, statutory standard to order an HIV test would apply to someone who has been convicted but that someone who has been merely arrested and charged with a crime could be ordered to have an involuntary HIV test conducted on him under the more lenient, less exacting standard, articulated in part III of the majority opinion.

As I am sure the majority would, I acknowledge that § 54-102a (b) is not a model of clarity, but the interpretation advanced by the state and the majority would permit trial courts to order HIV testing anytime the defendant has been charged with one of the offenses enumerated in the statute, the alleged offense involved a completed sexual act, and the criminal case is pending. As the majority acknowledges in part III of its opinion, this is nearly standardless and requires this court to supply an interpretive gloss to save the constitutionality of § 54-102a (b). ''[I]t is well established that this court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities . . . .'' (Internal quotation marks omitted.) *Kuchta* v. *Arisian*, 329 Conn. 530, 548, 187 A.3d 408 (2018); see also *State* v. *Cook*, 287 Conn. 237, 245, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). ''[W]hen called [on] to interpret a statute, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent.'' (Internal quotation marks omitted.) *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991). Given that § 19a-582 (d) (8) supplies the legislatively determined standard for the court to apply when ordering HIV test-

State *v.* Bemer

ing under § 54-102a (b), I fail to see why the majority has created a constitutional problem by unnecessarily construing § 54-102a (b) in a manner necessitating an interpretive gloss to save the constitutionality of the statute.[9] As we have explained, "[e]stablished wisdom counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions. . . . It is nevertheless relevant to our construction of the statute that our interpretation avoids constitutional perils." (Citations omitted; internal quotation marks omitted.) Id., 89–90. Consistent with this principle, I conclude that the "[n]otwithstanding" language in § 54-102a (b) applies only to those aspects of § 19a-582 that would require the defendant's informed consent and any provision that would limit or prohibit the disclosure of the test results to the victims. All other aspects of § 19a-582—including the court procedures and legal standard set forth in subsection (d) (8)— remain applicable to a court order for involuntary HIV testing under § 54-102a (b).

With respect to a court-ordered examination for sexually transmitted diseases pursuant to § 54-102a (a), the majority correctly notes, and the defendant conceded at oral argument, that the requirements for ordering HIV testing under § 19a-582 (d) (8) do not apply to motions for an examination for sexually transmitted diseases under § 54-102a (a). See part II of the majority

---

[9] The majority also notes that it "know[s] of no other court that has found [a provision like § 54-102a] to be unconstitutional or determined that an interpretive gloss was necessary to avoid constitutional infirmity. In these circumstances, the tenet of statutory construction on which the concurrence relies simply has no utility in evaluating legislative intent." Footnote 20 of the majority opinion. The majority need look no further than the present case, in which the majority itself recognizes that, under its construction of the statute, an interpretive gloss is necessary to save the constitutionality of the statute. Indeed, it is for this reason that I fail to understand how the majority can conclude that its construction is "the only reasonable one"; id.; when that construction renders the statute unconstitutional without its supplied judicial gloss.

State *v.* Bemer

opinion. The majority thus states that, "even if we were to interpret § 54-102a (b) to avoid the need for a constitutional gloss on that statutory subsection, we still would have to place the identical gloss on its companion subsection, § 54-102a (a), pertaining to examination for sexually transmitted diseases." (Emphasis omitted.) Footnote 20 of the majority opinion. As a result, the standards for court-ordered testing for HIV and for an examination for sexually transmitted diseases would be different.

To the extent the majority reasons that this court must supply an interpretive gloss to subsection (b) of § 54-102a because subsection (a) of that statute requires one and the two subsections must have the same standard, I disagree. It is reasonable that court-ordered testing for HIV and an examination for sexually transmitted diseases would be treated differently. In fact, the legislature has emphasized that the disclosure of an individual's HIV status can deter future HIV testing and can lead to discrimination. See, e.g., *Doe* v. *Marselle*, supra, 236 Conn. 853–54 (chief of AIDS section for then Department of Health Services testified before legislature, "emphasizing that confidentiality is essential 'to protect people from the discrimination that often comes with the knowledge that a person has AIDS [acquired immune deficiency syndrome] or HIV infection' "). Specifically, in § 19a-583 (a) (10), which sets forth the limitations for the disclosure of HIV related information, the legislature directed courts that, "[i]n assessing compelling need, the court shall weigh the need for disclosure against the privacy interest of the test subject and the public interest which may be disserved by disclosure w*hich deters future testing or which may lead to discrimination.*" (Emphasis added.) General Statutes § 19a-583 (a) (10) (A).

It is entirely reasonable to conclude that the legislature treated testing for HIV and an examination for

339 Conn. 528 NOVEMBER, 2021 597

State *v.* Bemer

sexually transmitted diseases differently given the heightened discrimination and stigma that HIV status carries. The persistent, endemic discrimination, and even criminalization, related to HIV is undeniable in our country. People living with HIV face, among other things, significant housing discrimination; see, e.g., The Center for HIV Law & Policy, Housing Rights of People Living with HIV/AIDS: A Primer (March, 2010) p. 3, available at https://www.hivlawandpolicy.org/sites/default /files/housingprimer3.10.pdf (last visited July 13, 2021); and employment discrimination. See, e.g., The Center for HIV Law & Policy, Employment Rights of People Living with HIV/AIDS: A Primer (September, 2010) p. 4, available at https://www.hivlawandpolicy.org/sites /default/files/CHLP%20Employment%20Primer%20sept% 202010%20FINAL.pdf (last visited July 13, 2021). Additionally, "[a]s of 2020, [thirty-seven] states have laws that criminalize HIV exposure"; Centers for Disease Control & Prevention, HIV and STD Criminalization Laws (last updated December 21, 2020), available at https://www.cdc.gov/hiv/policies/law/states/exposure.html (last visited July 13, 2021); despite the fact that "empirical studies on the impact of these laws suggest that they do not decrease HIV infections or have any other positive public health impacts," and that these laws may actually result in higher rates of transmission. Z. Lazzarini et al., "Criminalization of HIV Transmission and Exposure: Research and Policy Agenda," 103 Am. J. Pub. Health 1350, 1352 (2013). An individual's HIV status carries with it various stigmas that are not implicated to the same extent as an individual's sexually transmitted disease status. See, e.g., B. Anderson, "HIV Stigma and Discrimination Persist, Even in Health Care," 11 AMA J. Ethics 998, 998 (2009) ("HIV *is* different from many other diseases. Finding out that one has HIV presents complex physical, emotional, social, and legal concerns that do not arise when one is tested for

other conditions, including other communicable diseases." (Emphasis in original.)). As such, it is logical to conclude that a trial court would be required to employ two different standards when ordering involuntary testing for HIV and an examination for sexually transmitted diseases.

Accordingly, I would conclude that the requirements set forth in § 19a-582 (d) (8) must be met prior to the issuance of an order for involuntary HIV testing under § 54-102a (b). The requirements set forth in part III of the majority opinion—namely, that the testing would provide useful, practical information that cannot reasonably be obtained otherwise—would be applicable to a court-ordered examination for sexually transmitted diseases under § 54-102a (a). Because the trial court did not apply either standard, I would reverse the decision of the trial court to grant the motions of the state and the victims that the defendant be required to submit to HIV testing pursuant to § 54-102a (b) and an examination for sexually transmitted diseases pursuant to § 54-102a (a), and remand the case to the trial court for further proceedings.

Accordingly, I concur in the judgment.